**C.J. SCOTT, Plaintiff–Appellant,**

**v.**

**T.A. COUGHLIN, Commissioner, Docs; Philip Coombe, Jr., Acting Commissioner, Docs; Hans Walker, Superintendent, Auburn Correctional Facility; Lieutenant Perkins; J. Stone; M. Buehler, Correctional Officer; R. Shaw; W. Dibiase; F. Deluke, Correctional Officer; Roberts, Hearing Officer; J. Stinson, Superintendent; and J. Rando, Defendants–Appellees.**

**Docket No. 99–0365.**

United States Court of Appeals, Second Circuit.

Submitted Oct. 7, 2002.

Decided Sept. 17, 2003.

Mitchell S. Kessler, Cohoes, New York, submitted a brief for Plaintiff–Appellant.

Robert M. Goldfarb, Assistant Solicitor General, Albany, New York (Eliot Spitzer, Attorney General, Andrea Oser, Assistant Solicitor General for the State of New York, Albany, New York, of counsel), submitted a brief for Defendants–Appellees.

Before: WALKER, Chief Judge, CARDAMONE, and STRAUB, Circuit Judges.

CARDAMONE, Circuit Judge.

We deal on this appeal with a prison inmate's suit brought against two corrections officers for alleged violations of his civil rights. A reading of the record affords us a small glimpse of prison life made more vivid by the words of Thomas Mott Osborne, a New York State penologist, who volunteered to spend a week incognito in Auburn State Prison, a maximum security facility. He later wrote: "An aching, overwhelming sense of the hideous cruelty of the whole barbaric, brutal business sweeps over me; the feeling of moral, physical and mental outrage; ... iron walls at our backs; ... and the overpowering, sickening sense of accumulated misery ... haunting the place."[1]

C.J. Scott (plaintiff, appellant, or inmate) is presently incarcerated by the New York State Department of Correctional Services, serving a lengthy term after two convictions for assault in the first degree, one in 1980 and the other in 1989. At the time of the incidents that are the subject of this appeal, Scott was imprisoned at Great Meadow Correctional Facility in Comstock, New York. As a result of disciplinary action taken against him by prison officials, he instituted *pro se* a civil rights action under 42 U.S.C. § 1983 in the United States District Court for the Northern District of New York (Kahn, J.), naming as defendants the Commissioner of the New York State Department of Correctional Services and a number of corrections officers, all of whom, with two exceptions, were dismissed from the action. The two exceptions are Corrections Officers (CO or officer) Frank DeLuke and James Rando, the only remaining defendants in this action.

Plaintiff filed two amended complaints, the second amended complaint being that of February 5, 1996. The gist of the complaint is that Corrections Officers DeLuke and Rando violated Scott's civil rights and, when he complained to prison authorities, they retaliated against him in violation of his First Amendment rights by filing false disciplinary infraction charges against him. Further, the complaint alleges, in taking disciplinary action the defendants used excessive force in violation of the Eighth Amendment.

## FACTS

### A. Incident Involving Corrections Officer DeLuke

1. *Plaintiff's Allegations.* The stage for this incident was set on February 10, 1992. On that day, plaintiff along with 20–40 other inmates, who were at the facility's commissary in the laundry area, observed a fellow inmate, Alonzo Jacobs, being assaulted by corrections officers. In March 1992 Scott furnished Alonzo Jacobs with a signed witness statement supporting Ja-

---

1. Gene Fowler, The Great Mouthpiece: An Allegation in Lavender (1931), *reprinted in* Law in Action: An Anthology of the Law in Literature 292, 297 (Amicus Curiae ed., 1947). T.M. Osborne later served as warden of Sing Sing prison in Ossining, New York. *Id.*

cobs' claim against the guards for their use of excessive force.

Shortly thereafter, according to plaintiff, Officer Green began harassing him, prompting him to file a grievance with the Department of Corrections. Later, on May 18, 1992 Green said to CO Frank DeLuke in plaintiff's presence, "that's him Frankie, . . . he made the statement for Jacobs." In response to this revelation, Officer DeLuke told Scott that "you will get yours real soon—*WE WILL* get you soon," and indicated that Scott would be physically harmed. Plaintiff promptly reported this threat to Department of Corrections officials.

Two days later, on May 20, 1992, Scott was in his cell when Officers DeLuke and Green assaulted him. The two officers singled him out for a pat frisk, and when Scott attempted to call for a sergeant— apparently fearing that the frisk was a pretext for an assault—Officer DeLuke either kicked him or punched him in the head. Officer Green knocked him to the ground, and Officer DeLuke elbowed him in the back. Scott claims that the assault aggravated a pre-existing back condition. He was given a medical examination on that day, but received no treatment for back pain. Scott's affidavit maintains his physical examination was cursory.

2. *Defendants' Response.* In seeking summary judgment defendants submitted no responsive affidavits to counter plaintiff's version of this incident. Instead, they relied on an inmate misbehavior report Officer DeLuke filed shortly after the confrontation with plaintiff and a transcript from the ensuing disciplinary hearing. In his report defendant DeLuke recounts that he asked Scott to spread his legs for a routine frisk and that Scott placed his hands on the wall, but refused to spread his legs. After a second direct order, Scott allegedly started yelling loud-

ly for a sergeant. When the sergeant arrived and told Scott to spread his legs, he finally did so.

Defendant DeLuke alleges Scott violated a number of prison rules including failure to follow an order, refusal to submit to a frisk, and creating a disturbance. Scott insists these accusations amount to trumped-up charges lodged against him in retaliation for his help to Alonzo Jacobs. While the charges were pending, plaintiff was placed in confinement until his disciplinary hearing, which was held three days later on May 23, 1992.

3. *Hearing and Result.* At the hearing plaintiff was questioned about what Officer DeLuke had said in his report. Scott's answers were not clear

> HEARING OFFICER: Did the officer tell you to spread your legs apart and you refused?
>
> SCOTT: No the officer kicked me, I went to, not toward me but the blanket that was on the floor moved and I went down and I did call the sergeant.
>
> . . .
>
> HEARING OFFICER: And why wouldn't you spread your legs like the officer said here when he told you to do so?
>
> SCOTT: Again officer Green and [DeLuke] intends to assault me.

The hearing officer apparently took Scott's last response to be an admission of wrongdoing, and therefore found him in violation of the prison rules as charged. Punishment consisted of 30 days confinement in keeplock, loss of commissary, phone and package privileges, and a $5.00 levy on his prison account for hearing costs.

### B. *Incidents Involving Corrections Officer Rando*

1. *Plaintiff's Allegations.* The facts of the second incident Scott complains of are also murky. Plaintiff asserts that some-

time in early October 1991, CO Rando confiscated from Scott's cell legal papers relating to a law suit Scott had brought against another prison employee, Sergeant Phair. Scott complained about Officer Rando's action in an employee misconduct report submitted to the prison superintendent on October 13, 1991, and also reported the incident in writing to a sergeant. Shortly after filing the complaints, plaintiff began to experience repeated harassment from CO Rando, who stalked Scott, calling him "nigger" and telling him that he did not like people who complained to sergeants. On January 10, 1992 after again complaining to a sergeant about Officer Rando's behavior, Scott was advised to file an administrative complaint. Instead, on January 15, 1992, Scott sought protective custody. Prison officials denied the request, informing him that he could only obtain protective custody for protection from other prisoners, not from prison officers. Plaintiff was nonetheless transferred to an adjacent cell block.

On March 22, 1993 Officer Rando accused Scott of failing to perform his food service duties, and placed him in keeplock as punishment. Officer Rando told him, in substance, "You like to write complaints. I remember the two you wrote on me. You're going to get it Scott. I told you I will get you." The next day, on March 23, 1993, Scott once again encountered Officer Rando, who ordered Scott to assume the frisk position, saying, "I want to search you because you stink." Scott states that after he complied, CO Rando struck him in the neck with his baton. Plaintiff then went to an intercom console and asked to be locked in his cell, whereupon CO Rando hit him in the head and shoulder. Scott repeatedly asked another guard who was present, Officer Woods, to intervene on his behalf, but this merely prompted Officer Rando to strike him on the head, groin, abdomen and wrist. Plaintiff then ran and found assistance from other officers, who escorted him to the infirmary.

2. *Defendants' Response.* Defendants' papers filed with the district court in support of their motion for summary judgment contain no affidavits controverting Scott's version of this incident. Again, defendants rely primarily on inmate misbehavior reports filed by COs Rando and Woods shortly after the event took place. Both reports state that this occurrence arose during the two officers' attempt to subdue Scott after he disobeyed orders and attacked the officers while they were trying to stop him from running.

According to Officer Rando's account, Scott was running past him and Officer Woods in Cell Block C when Rando ordered him to stop. When Scott stopped, Officer Rando says he told Scott to put his hands on the wall in preparation for a pat frisk. But Scott ran, forcing the officers to chase him. Officer Rando recounts that when they caught up to Scott, he told plaintiff to put his hands on the bars, but Scott disobeyed and instead grabbed the officer's baton. Officer Woods struck Scott, causing him to release the baton. Scott attempted to run, but Officer Woods was able to restrain him until Scott struck Woods, breaking his grip. Scott ran again, and the officers pursued him. In the course of the chase, Officer Rando alleges that Scott swung at him, prompting the officer to strike Scott with his baton. The officer states further that Scott eluded the pursuing officers by pushing tables in front of them and throwing a bread rack at them. Eventually, Rando states, the officers subdued the inmate, who was taken to the infirmary. CO Rando's report cited Scott for violation of prison rules 100.11 for attempted assault, 106.10 for violating a direct order, 104.11 for engaging in violent conduct, and 107.10 for physically obstructing employees.

Officer Woods' report generally corroborated Officer Rando's story, although it only specifically recounted the moments when Scott grabbed Officer Rando's baton and when Scott escaped from Officer Woods' grip. The report cited Scott only for violating rule 100.11, for assault.

A nurse's examination of Scott after the incident found redness and swelling in his left knee and wrist, but noted no other injury. X-rays were ordered, the results of which cannot be ascertained from the record.

3. *Hearing and Result.* Officers Rando and Woods' reports prompted a disciplinary hearing for the inmate, at which he was allowed to and did call several other inmates as witnesses. The other inmates confirmed that they had seen Scott being chased by prison guards. The witnesses stated that during the course of the chase Scott repeatedly shouted, "Why is you all jumping me?" and that at one point the guards forced Scott's hands up onto the bars of a cell. Officer Rando testified at the hearing, answering the hearing officer's questions in a manner consistent with his filed misbehavior report. At the conclusion of the hearing, Scott was sentenced to 180 days of confinement in a Segregated Housing Unit (solitary confinement) with loss of commissary, package and telephone privileges, and a $5.00 levy for hearing costs.

## C. *District Court Proceedings*

In response to the two hearings and the resulting punishment, plaintiff instituted the present litigation in the Northern District of New York. Plaintiff and defendants both made motions for summary judgment. The district court granted defendants' motion and denied plaintiff's motion in a judgment entered on November 5, 1999, which dismissed plaintiff's case in its entirety. From that judgment, plaintiff appeals.

## DISCUSSION

### I Standard of Review

We review the district court's grant of defendants' motion for summary judgment *de novo, see Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003), to determine whether the record reveals any genuine issue of material fact in dispute that would preclude that result. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party—here, plaintiff.

### II Retaliation

#### A. *Legal Standards*

To establish a *prima facie* case of First Amendment retaliation, a plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Yet, in a retaliation case that is supported by detailed and persuasive factual allegations summary judgment without full discovery may be inappropriate. *Id.* Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.,* that even without the improper motivation

the alleged retaliatory action would have occurred. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive. *Id.; see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

In his cause of action against Officers DeLuke and Rando, Scott correctly asserts that his involvement in filing claims against prison officials and helping others to do so was protected activity, as it was an exercise of his right to petition the government for redress of grievances under the First Amendment. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Appellant then asserts that the disciplinary actions taken against him by the two corrections officers were based upon false charges and in retaliation for his protected activity. *See id.* With this background in mind, we review appellant's claims.

### B. *Claim Against Defendant DeLuke*

We first consider Scott's claim that Officer DeLuke retaliated against him in violation of 42 U.S.C. § 1983 for Scott's exercise of First Amendment rights. The district court ruled that even if Scott established a *prima facie* case of retaliation with respect to defendant DeLuke, his cause of action would fail because the retaliatory action—the disciplinary hearing and possible physical assault—would have occurred regardless of the existence of a possible retaliatory motive. In so ruling, the trial court relied solely on Scott's statements in the first disciplinary hearing—which we set out earlier—and interpreted them to be an admission from Scott that he had disobeyed Officer De-Luke's order. Relying on *Lowrance,* 20

F.3d at 535, it then held that the punitive action taken against Scott was justified regardless of Officer DeLuke's motive.

We are unable to concur with the district court because its interpretation of plaintiff's statements impermissibly drew an inference against plaintiff, the non-moving party, and awarded summary judgment to defendant on the basis of that inference. It is not at all clear that Scott's statements can be taken as an admission of wrongdoing. A reasonable juror could just as easily find that Scott denied disobeying DeLuke's orders, given that his initial response to the hearing officer's inquiry as to whether he had disobeyed the order was "No the officer kicked me."

Moreover, plaintiff submitted a detailed sworn statement to the district court on March 19, 1999, clarifying that he did not disobey the order. In it he stated

On May 20, 1992, Green and DeLuke accosted me in my cell and ordered me in the frisk position. Pursuant to facility rules, I was required to remove the linens and blanket from my bed and stand on the blanket, which I did. While I was in this position, DeLuke punched me in the head. Green then pulled the blanket out from under my feet, causing me to fall. While I was on the floor, DeLuke elbowed me in the back. This incident aggravated an existing back condition. Ever since the incident, my back pain has been worse than it was before.

■ In light of this, we are unable to adopt the trial court's unequivocal finding that Scott admitted to disobeying defendant DeLuke's order or that he actually did so. Instead, we think a genuine issue of material fact exists regarding whether Scott disobeyed the order. As a consequence, summary judgment should not have been granted on the theory that a proper motive for Officer DeLuke's actions

existed. *Cf. Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568 (disciplinary action does not constitute unlawful retaliation if proper motive existed alongside of improper one and the disciplinary action would have been taken regardless of the improper motive).

### C. *Claims Against Defendant Rando: Merits*

We turn next to plaintiff's claims of retaliation against defendant Rando.

1. *First Claim.* Although the district court never clearly identifies them, there appear to be two separate retaliation claims asserted against Officer Rando. Summary judgment was granted in favor of defendant Rando on the first one without the district court specifically identifying the facts. It stated

On the first of these occasions, Plaintiff contends retaliation due to a complaint he allegedly wrote about defendant Rando. Plaintiff, however, submits that Officer Rando did not retaliate against him but rather, other nonparties retaliated against him.

Apparently, the trial court was referring to the sequence of events that began in October 1991, on which Scott focused in his summary judgment papers. As earlier explained, after plaintiff filed a lawsuit against Sergeant Phair, Officer Rando allegedly confiscated legal papers from Scott's cell in retaliation for his filing the lawsuit. When Scott complained about Rando's conduct, Rando began harassing him; when Scott again complained, he was told to file a grievance, but instead sought and was denied protective custody.

 Assuming this was the incident to which the district court was referring, the court was factually incorrect to conclude "other nonparties" retaliated against Scott. Scott alleges specific facts in his complaint and affidavit that describe a "campaign of harassment" against him conducted specifically by Officer Rando and stemming from Scott's suit against Sergeant Phair. Further, we find no evidence in the record that nonparties retaliated against Scott on behalf of defendant Rando. Thus, Scott's first claim against Rando was inappropriately dismissed, and factual issues exist warranting further proceedings.

2. *Second Claim.* The district court describes Scott's second claim against CO Rando as "an incident in which Plaintiff testified that he was viciously attacked for 20 minutes and in order to save his life he had to run from his attacker." We assume that the district court is referring to the incident that took place on March 23, 1993, during which Officers Rando and Woods chased Scott through Cell Block C. The district court dismissed Scott's claim based on its conclusion that Scott's ambulatory health record from his exam following the incident did not indicate any significant abnormalities and that Scott did not present any other medical evidence to substantiate his claims.

We disagree with the district court's conclusion. First, although Scott's medical records do not indicate that he suffered as much harm as his affidavit suggests, the records standing alone are inconclusive. Scott's medical records noted the possibility that he suffered a bone fracture. Second, plaintiff submitted an affidavit describing the extent of his injuries. These sworn statements are more than mere conclusory allegations subject to disregard, *see Flaherty,* 713 F.2d at 13; they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

By finding against Scott on the basis of the disparity between some of Scott's med-

ical records and statements in his affidavit, the district court made an impermissible credibility determination and weighed contradictory proof. The credibility of Scott's statements and the weight of contradictory evidence may only be evaluated by a finder of fact. *See Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 621–22 (2d Cir.1999). Hence, summary judgment was inappropriately granted on the basis of Scott's ambulatory health record.

On appeal, defendants argue that regardless of the existence or extent of Scott's injuries, dismissal of plaintiff's claims is still warranted under the dual-motive theory. Defendants insist that the main disciplinary action taken against Scott—his confinement and loss of privileges—would have been taken irrespective of Rando's possibly retaliatory motive in filing his report because CO Woods, who is not accused of a retaliatory motive, filed a corroborating report justifying Scott's punishment. *See Lowrance,* 20 F.3d at 535.

While it may be true that Scott would have been punished in any event, it is not at all clear that Scott would have been punished to the same extent absent defendant Rando's report. Officer Woods' report discusses solely the incident in which Scott grabbed Rando's baton, and charges only a violation of the rule against assaulting an officer. Defendant Rando's report, on the other hand, is much more extensive, alleging assault, violent conduct, physical obstruction of employees, and refusal to obey a direct order. Based on both of these reports, plaintiff was placed in a Segregated Housing Unit (solitary confinement) and deprived of privileges for 180 days (6 months).

■ We believe an issue of fact exists as to whether Scott would have suffered the same punishment regardless of Officer Rando's retaliatory motive. We recognize

that a defendant may successfully meet his burden of justifying a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report," *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). In the present case, however, the record contains no evidence from which we can determine whether the most serious of the offenses plaintiff allegedly committed was indeed charged in Officer Woods' report, or whether the charged offenses, which appeared only in Officer Rando's report were serious enough to significantly impact Scott's punishment. If it is shown that defendant Rando acted with retaliatory motive, then any disparity between the punishment Scott received and what he would have received absent Officer Rando's report must be deemed retaliatory.

### D. *Claims Against Defendant Rando: Failure to Exhaust Administrative Remedies*

The district court held, in the alternative, that plaintiff's first claim of retaliation against Officer Rando was barred by the Prison Litigation Reform Act of 1995 (PLRA), Pub. L. No. 104–134, § 803(d), 110 Stat. 1321–66, 1321–71 (1996). The PLRA amended 42 U.S.C. § 1997e to require that inmates exhaust all available administrative remedies before bringing an action with respect to prison conditions under § 1983 or any other federal law. *See* 42 U.S.C. § 1997e(a) (2000). Previously, exhaustion could be required at the discretion of the judge, but only if the available remedies were expedient and met certain conditions. *See* 42 U.S.C. § 1997e(a) (1994); *Porter v. Nussle,* 534 U.S. 516, 523–24, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The trial court held that the PLRA precludes Scott's claim because he did not file a grievance against

defendant Rando when he was advised to do so after the incidents that began in October 1991.

■ We hold—and appellees do not contest on appeal—that the district court's ruling was error. The new compulsory exhaustion requirement contained in the PLRA cannot be applied retroactively to an action pending when the PLRA was signed into law. *See Salahuddin v. Mead,* 174 F.3d 271, 274 (2d Cir.1999). Because the PLRA became law in 1996, and this action has been pending since 1994, it follows that the PLRA does not automatically preclude Scott's claim on the ground that he did not exhaust his administrative remedies. Applying the older form of 42 U.S.C. § 1997e, the district court could have elected to apply the exhaustion requirement, but only after making a finding about adequacy of available remedies. Such a finding was not made in this case. Hence, the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (2000), does not preclude Scott's claim against Rando.

### III Excessive Force

■ We turn finally to plaintiff's claims of the use of excessive force, which he lodged against both defendants DeLuke and Rando under 42 U.S.C. § 1983. Appellant charges that Officers DeLuke and Rando used excessive force in their treatment of him, violating the Eighth Amendment of the Constitution. The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *See Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). "The absence of serious injury is ... relevant to the Eighth Amendment inquiry, but does not end it." *Id.* at 7, 112 S.Ct. 995.

■ To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (citing *Hudson,* 503 U.S. at 7, 112 S.Ct. 995).

■ The district court did not discuss the issue of excessive force with regard to defendant DeLuke. With regard to defendant Rando, the district court dismissed plaintiff's claims without considering most of the above factors, relying instead solely on its conclusion that Scott's medical records after the March 1993 incident with Officer Rando indicated only a slight injury. We have already discussed the inadequacy of those medical records for summary judgment purposes. Moreover, because the extent of injury must be considered in context, it was improper to resolve the issue on summary judgment without at least some weighing of the other factors. Although Scott's evidence may be thin, his own sworn statement is adequate to counter summary judgment in this case and must be weighed by a trier of fact. *See Colon,* 58 F.3d at 872.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is vacated, and the case remanded for further proceedings not inconsistent with this opinion.