**FIRST NATIONAL INSURANCE COMPANY OF AMERICA,**
Plaintiff

v.

**JOSEPH R. WUNDERLICH, INC,**
Joseph Wunderlich and Jean
Wunderlich Defendants.

**No. CIV. 102CV0471RFT.**

United States District Court,
N.D. New York.

March 29, 2004.

Torre, Lentz Law Firm, Jericho, NY (Brad A. Schlossberg, of counsel), for plaintiff.

Office of Livingston T. Coulter, Schuylerville, NY (Livingston T. Coulter, of Counsel), for defendants.

### *MEMORANDUM DECISION AND ORDER* [1]

TREECE, United States Magistrate Judge.

Originally, the Plaintiff had moved for summary judgment against the Defendants, pursuant to FED. R. CIV. P. 56(a), based upon an indemnification agreement. Dkt. Nos. 21–23. At the time of the Motion for Summary Judgment, the Court had before it a Complaint which was premised upon a indemnification agreement and a single construction contract (Contract 1–99) of which it is alleged that the Defendants' had defaulted causing the Plaintiff to assume responsibility to complete the contract and incur expenses. Dkt. No. 1,

---

**1.** By an Order of Reference and Consent of the Parties, dated August 5, 2002, this matter was transferred to this Court. Dkt. No. 7; *see* 28 U.S.C. § 636(c).

Compl. Such reliance was in error because the Plaintiff's damages actually arose out of three, not one, construction contracts, albeit the contracts are inextricably related and the Plaintiff is suing Defendants on this specific indemnification agreement. *Id.* Once this error in the Complaint was revealed by Defendants' opposition to the Summary Judgment Motion, the Plaintiff readily acknowledged this inadvertence and asked, in the alternative, to amend its Complaint so that it accurately reflect the true events and confirms the facts set forth in the statements of facts. The Court was prepared to address the Motion for Summary Judgment but deferred and accepted the more cautious route of permitting the Plaintiff to amend its Complaint and further supplement the request for damages by providing an appropriately detailed affidavit for attorney fees and costs. Dkt. No. 30, Order, dated Sept. 30, 2003.

Plaintiff complied with the Court's directive and submitted an Amended Complaint that identifies the two underlying contracts (1–99 & 2–99). Dkt. No. 31, Am. Compl. An Amended Answer ensued shortly thereafter (Dkt. No. 33), however, the next turn in this litigation was quite unexpected. Since the Defendants initially raised the issue of factual deficiencies in the Complaint compelling an amendment thereto which was ultimately completed as requested, one would have expected that the Court would quickly return to the original Motion for Summary Judgment and decide the Motion, notwithstanding the Court's observation in the order that by inviting the filing of an amended complaint that the parties would not lose any remedies or challenges. Dkt. No. 30. It then came as quite a surprise when the Defendants filed a Motion to Dismiss the Amended Complaint based upon both personal and subject matter jurisdiction which had not been previously raised. Dkt. No. 37 & 38. Surprise notwithstanding, the Court will not consider these two dispositive Motions independently but rather interdependently. Judicial economy requires us to do so, therefore, the Defendants' Motion to Dismiss will be viewed in the context of the Motion for Summary Judgment and deemed as the Defendants' Cross Motion to Dismiss and opposition to the initial Motion.[2] For all of the reasons stated below, the Plaintiff's Motion for Summary Judgement is **Granted** and the Defendants' Cross Motion to Dismiss is **Denied.**

## I. HISTORY

First National Insurance Company of America is an affiliate of SAFECO Insurance Companies with whom the Defendants, a corporation and two individuals, executed a General Agreement of Indem-

---

2. The record for this Motion for Summary Judgment is now rather extensive. The Court is considering the following pleadings in determining this Motion for Summary Judgment:

For the Plaintiff:
Dkt. No. 21, Notice of Mot. for Summ. J., Ira Sussman, Esq., Aff., dated Jan. 22, 2003, with Exhibits; Dkt. No. 22, 7.1 Statement of Facts; Dkt. No. 23, Pl.'s. Mem. of Law; Dkt. No. 28, Ira Sussman, Esq., Reply Aff., dated June 26, 2003, with Exhibit; Dkt. No. 31, Am. Compl., with Exhibits; Dkt. No. 32, Sean P. Kelley, Esq., Aff for Atty. Fees, dated Oct. 22, 2003; Ex. 39, Aff. in Opp. to Mot. to Dismiss, with Exhibits; Dkt. No. 40, Pl. Mem. of Law.

For the Defendants:
Dkt. No. 24, Defs.' Resp. to Pl.'s Statement of Facts; Dkt. No. 25, Joseph Wunderlich Aff. in Opp., dated March 31, 2003; Dkt. No. 26, Defs'. Mem. of Law; Dkt. No. 33, Am. Answer; Dkt. No. 34, Resp. to Atty. Fees; Dkt. No. 37, Defs.' Mot. to Dismiss, Joseph R. Wunderlich, Aff. dated Nov. 13, 2003, with Exhibits; Dkt. No. 38, Defs.' Mem. of Law; Dkt. No. 41 Defs.' Reply Mem. of Law.

nity For Contractors (Agreement) on June 30, 1998. Dkt. No. 31, Ex. 1 (the Indemnity Agreement). Because of the nature of the exhaustive list of defenses raised by the Defendants to this Motion for Summary Judgment, implicating various provisions of the Agreement, it is incumbent upon us to reveal, in some detail, the most salient and relevant terms of the Agreement, an agreement which the Defendants agreed upon in order to have this Plaintiff–Surety underwrite performance bonds on their construction contracts.

*(1) Purpose:*

[F]or the purpose of indemnifying the SAFECO Insurance Companies from all loss and expense in connection with any Bonds for which any SAFECO Insurance Company now is or hereafter becomes Surety . . . .

*(2) Surety:*

Any one or combination of the following: SAFECO . . . First National Insurance Company of America . . . .

*(3) Default:*

Contractor shall be deemed to be in default . . . in the event: (1) Is declared to be in default by the Obligee of any Bond; (2) Actually Breaches or abandons any Contract; (3) Fails to pay . . . claims, bills, or indebtedness incurred in connection with the performance of any contract . . . .

*(4) Indemnity:*

(1) All loss, costs and expenses . . . including court costs, reasonable attorney fees . . . consultant fees, investigative costs and any other losses, costs or expenses incurred by Surety by reason of having executed any Bond, or incurred by it on account of any Default under

this agreement by any of the Undersigned . . . .

*(5) With respect to Claims against Surety:*

Surety shall have the exclusive right for itself and the Undersigned to determine in good faith whether any claim or suit upon any Bond shall, on the basis of belief of liability, expediency or otherwise, be paid, compromised, defended or appealed . . .

*(6) Surety's Remedies in the Event of Default:*

(1) Take possession of the work under any and all Contracts and to arrange for its completion by others or by the Obligee of any Bond . . . (4) Take such other action as Surety shall deem necessary to fulfill its obligation under any Bond.

*(7) Security to Surety:*

(c) Monies due or to become due Contractor on any Contract, including all monies earned or unearned which are unpaid . . . . (d) Any actions, causes of action, claims or demands whatsoever which Contractor may have or acquire . . . .

Dkt. No. 31, Ex. 1.

On October 18, 1999, Defendants entered into a contract with the Town of Schaghticoke to construct water transmission and distribution main lines along New York State Route 40 (Contract 1–99). Dkt. No. 25, Wunderlich Aff. at ¶ 2; Dkt. No. 28, Sussman Aff. at ¶ 3. This contract had a bid price of $1,588,195 and required performance and labor & material bonds, which were furnished to the Town on November 9, 1999. Dkt. No. 25, Wunderlich Aff., at ¶ 3; Dkt. No. 31, Am. Compl., Ex. 2 (Performance Bond # 6024599). Among other things, the parties to these bonds were identified as: (1) the Town as the owner, (2) the Defendants as contractor

and (3) First National Insurance Company of America as the surety. Dkt. No. 31, Ex. 2. The overall public work project for the Town was rather large and had other components or stages of construction.

On January 15, 2000, Defendants entered into another contract with the Town of Schaghticoke for the construction of water transmission and distribution main lines (Contract 2–99) for the stated price of $1,896,196. Dkt. No. 25 at ¶ 3; Dkt. No. 28 at ¶ 3. Likewise, performance and labor & material bonds, identifying the same parties as the previous bonds, were required, which the Defendants furnished to the Town on February 14, 2000. Dkt. No. 25 at ¶ 3; Dkt. No. 41, Ex. 2 (# 6024606). It appears that Contract 1–99 and 2–99 pertain to construction work on different roads (town and state) which would eventually intersect when completed. Additionally, there was another related yet nominal contract between the Town and Defendants which was entered into on or about September 12, 2000, for the sum of $59,568 (Contract 3P–99). Dkt. No. 25 at ¶ 3; Dkt. No. 41 at p. 4. There remains a question whether performance and labor & material bonds were required for Contract 3P–99. With respect to Contract 3P–99, Defendants argued in the alternative that no bonds were either sought or waived, or the Town arbitrarily subsumed this Contract within the parameters of Contract 2–99. Dkt. No. 41 at p. 4; *see also* Dkt. No. 25 at ¶ 4.

At some point after all of the bonds were delivered to the Town on the respective contracts, Defendants commenced the work at hand on all of these contracts. Approximately more than a year later, on June 4 and 12, 2001, the Town terminated all of Defendants' contracts, declaring them in default. Dkt. No. 25 at ¶ 5. Initially, the Town forwarded a letter to an agent of the Plaintiff, Rose and Kiernan,

Inc., expressing its deep concern about the Defendants' performances on Contracts 1–99 and 2–99. Dkt. No. 31, Am. Compl., Ex. 3, Lt. of Kenneth Runion, Esq., dated Sept. 13, 2000. Approximately nine months later, by a letter dated June 4, 2001, the Town's attorney advised the Plaintiff that "Mr. Wunderlich has failed to perform the contract covered by the [ ] bond . . . [in that] New York State Department of Transportation revoked the work permit for State Route 40 due to Mr. Wunderlich's failure to properly perform . . . [and further] request[ed] that the surety fully perform and complete the work as provided by [the bond]." Dkt. No. 31, Ex. 4, Kenneth Runion, Esq., Lt., dated June 4, 2001; Dkt. No. 21 at ¶ 9; Dkt. No. 25 at ¶¶ 5–7.

Pursuant to the Town's demand, the Plaintiff interceded and assumed the remainder of the work at hand as to all three contracts. Dkt. No. 25 at ¶ 7. The Plaintiff hired Cranbrook Construction and McDonald Engineering to complete and oversee the work under the three contracts. Dkt. No. 25 at ¶¶ 5–8. Further, Plaintiff paid Best Paving Company (Best Paving), a subcontractor, on the outstanding balance due for all three contracts, particularly Contract 3P–99. Dkt. No. 28, Ex. 1. However, Best Paving's all-inclusive invoice for $147,509 does not allocate the cost among the contracts. Dkt. No. 31, Ex. 5. Similarly, neither Cranbrook nor McDonald, due to the nature and sequence of their respective work on these contracts, submitted separate bills or invoices for the work performed on all contracts. Dkt. No. 31, Ex. 6.; Dkt. No. 28 at ¶ 5.

Through this lawsuit, Plaintiff wishes to recover from Defendants all monies expended to complete the job(s), pay the subcontractor, and collect attorney fees and consultant fees less payments received from the Town upon the completion of the

contracts. The consultant fees are due diligence fees incurred in the investigation of the reasonableness of the subcontractors' bills. Total damages claimed by Plaintiff against the Defendants is $166,870.41.[3] Dkt. No. 31, Am. Compl; Dkt No. 32, Aff. of Costs and Fees.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to dis-

regard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.1994). Mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991).

### B. Indemnification Agreements

██ Defendants attack this Motion for Summary Judgment with everything they can muster. In addition to contending that there may exist genuine issues of facts as to various aspects of the Agreement and Plaintiff's acts and decisions in completing these contracts, Defendants assert that this Court has neither subject

---

**3.** Damages sought are calculated as follows:

| | | | |
|---|---|---|---|
| (1) Cranbrook Construction | $246,483.32 | | |
| (2) McDonald Engineering | 20,875.00 | | |
| (3) Best Paving | 147,509.99 | | |
| Total Payment to Contractors | 414,868.31 | | |
| Less Payment received from Town | 275,336.10 | | |
| Net Payment | | | 139,532.21 |
| (4) Attorney Fees | | | 20,235.90 |
| (5) Consulting Fees | | | 7,102.30 |
| Total Damages | | | $166,870.41 |

matter nor personal jurisdiction over this matter and that the Amended Complaint should be dismissed. Dkt. Nos. 34, 37, 38 & 41. The Defendants fail on all accounts. The challenges that they mount to certain events do not pose a genuine issue of fact, their complaints are merely conclusory and lastly, the facts and the law Defendants argue are taken out of context and misplaced. Thus they do not provide substantive and substantial arguments to avoid the evitable granting of this Motion for Summary Judgment.

First and foremost, the most critical flaw in the Defendants' last-minute argument against Summary Judgment, which cuts to the heart of all of their other assertions and contentions, is that this Court does not have either subject matter or personal jurisdiction of this claim because the labor and material bonds have a clause that reads "the place of trial of any action on this Bond shall be in the county in which the said Contract was to be performed ..." Dkt. No. 40, Ex. 2. If the Court were to follow Defendants' logic, since the Town of Schaghticoke is located in Rensselaer County in the State of New York, Plaintiff should have brought this action in New York State Supreme Court venue in Rensselaer County rather than here. The critical error in Defendants' reasoning is this: this lawsuit was not brought under the performance and labor and material bonds. To the contrary, the Plaintiff brought this action pursuant to the June 30, 1998 General Agreement of Indemnity. Contrary to Defendants' underlying postulations, performance and labor and material bonds are agreements to protect the owners and the subcontractors of a construction project, and, in this case, such owner would be the Town. *See Gen. Accident Ins. Co. of Am. v. Merritt–Meridian Constr. Corp.*, 975 F.Supp. 511, 516 (S.D.N.Y.1997) (wherein the court found " the performance bonds were expressly

entered into for the benefit of the owners."). Whereas, indemnity agreements, which are essential components to underwriting and providing economic assurances to such projects, protect the surety. *Id.* at 516 (Sureties serve "[an] important function in the construction industry" by providing to all of the parties to a "typical construction contract—owners, general contractors, subcontractors"—"assurance that defaults by any of the myriad other parties involved will not result in a loss to them.").

 Indemnity agreements, much like the agreement in our case, are valid and enforceable under New York law, and when a general contractor has agreed to indemnify the surety from any losses that may arise from contractor's default or claims arising out of surety bonds, such agreements fundamentally govern the relationship between the surety and contractor. *Gen. Accident v. Merritt–Meridian*, 975 F.Supp. at 515–16 (citing, *inter alia*, *Int'l Fid. Ins. Co., v. Spadafina*, 192 A.D.2d 637, 596 N.Y.S.2d 453 (N.Y.App. Div.2d Dep't 1993) and *BIB Constr. Co., Inc., v. Fireman's Ins. Co. of Newark, New Jersey*, 214 A.D.2d 521, 523–25 625 N.Y.S.2d 550 (N.Y.App. Div 1st Dept. 1995)); *see also North Am. Specialty Ins. Co., v. Montco Constr. Co., Inc.*, 2003 WL 21383231, at *5 (S.D.N.Y. May 9, 2003). Contractors and sureties like any other party to a contract are "free to fashion terms of their agreement" that meet their respective needs and obligations and to solidify their contractual relationships. *Lori–Kay Golf, Inc., v. Lassner*, 61 N.Y.2d 722, 723, 472 N.Y.S.2d 612, 613, 460 N.E.2d 1097 (N.Y.Ct.App.1984). In this vein, a party, in order to receive a contractual benefit, can abandon rights and bestow them upon the other party (i.e., assignments of rights, options to proceed, determinations of cost and the reasonable-

ness, settlement clause thereof). But to be certain in any event, a surety, in the final analysis, is "equitably entitled to full indemnity against the consequences of a principal obligor's default." *Id.* at 723, 472 N.Y.S.2d at 613, 460 N.E.2d 1097; *Bank of New York v. Hirschfeld,* 59 A.D.2d 976, 399 N.Y.S.2d 329 (N.Y.App. Div 3d Dep't), *appeal dismissed* 44 N.Y.2d 732 (1978).

■ Where the surety provides a bond to the owner of a construction project on behalf of the contractor and said owner determines that the contractor has defaulted and demands the surety, pursuant to the terms of the bond, to fulfill the contractor's obligations, the surety, generally speaking, is obligated to comply regardless of the surety's belief as to what occurred or caused the claim of default. *Gen. Ins. Co. of Am. v. Capolino Constr. Corp.,* 908 F.Supp. 197, 199 (S.D.N.Y. 1995); *see also Gen. Accident Ins. v. Merritt–Meridian,* 975 F.Supp. at 516 (owners' claims of default invoke indemnification agreements and the settlement of claims). Within these types of contracts, sureties are provided discretion and latitude to take whatever action necessary to settle claims and to complete the work at hand. *Gen. Accident Ins. v. Merritt–Meridian,* 975 F.Supp. at 516. As long as the surety acts in good faith in assuming the remaining contractual obligations and pay construction expenses accordingly, whether the contractor actually defaulted will neither affect the surety's right to be indemnified for expenses paid nor defeat the surety's motion for summary judgment. *Gen. Ins. v. Capolino,* 908 F.Supp. at 199; *Int'l Fid. Co. v. Spadafina,* 192 A.D.2d at 639, 596 N.Y.S.2d at 454–55 (It is irrelevant whether the contractor was actually liable). Absent bad faith, fraud or extravagance, the surety is entitled to pay the actual costs incurred in completing the construction project and then be provided indemnification pursuant to the agreement. *BIB Constr. Co. v. Fireman's Ins.,* 214 A.D.2d at 525, 625 N.Y.S.2d at 553; *Int'l Fid. v. Spadafina,* 192 A.D.2d at 639, 596 N.Y.S.2d at 454 (citing *Maryland Cas. Co. v. Grace,* 292 N.Y. 194, 54 N.E.2d 362 (1944)) (for the proposition that any payment made by sureties under the provisions of an indemnity agreement are scrutinized only for good faith and reasonableness as to the amount of the payment).

■ As long as the indemnity agreement is unambiguous, a court must give effect to the express terms contained therein and such interpretation is a matter of law which may be determined on a motion for summary judgment. *North Am. Specialty Ins. Co., v. Montco Constr. Co., Inc.,* 2003 WL 21383231, at *5. Disputes whether the contractor defaulted on his obligation or conclusory allegations of surety acting in bad faith are insufficient to defeat a motion for summary judgment. *Id.; see also Gen. Accident Ins. v. Merritt–Meridian,* 975 F.Supp. at 518; *Gen. Ins. v. Capolino,* 908 F.Supp. at 199.

■ In our case, as made evidently clear above, the Plaintiff is certainly the surety capable of enforcing the indemnity agreement and there is no genuine issue of fact, notwithstanding Defendants attempts to plead ignorance of actual facts. Unmistakenly, First National is identified as an affiliate of SAFECO Insurance Companies, and in such a capacity can initiate this lawsuit. In further support of this litigation status, explicitly noted as surety on the performance and labor and materials bond is First National. Dkt. No.31, Ex. 2; Dkt. No. Ex. 3.[4]

---

**4.** The Agreement states in pertinent part that the surety can be anyone or combination of

all of the affiliate companies or "in which any

Complaining that the surety did little to defend the Defendants on the owner's claim that they defaulted is meritless and meaningless. Opposing their termination was not a contractual obligation assumed by the Plaintiff but could have been an option if the Plaintiff so elected. It did not however. Plaintiff's election could have been guided by several letters raising the issue of the Defendants' questionable performance, and as of June 4, 2000, the Town declared the Defendants in default and demanded that the Plaintiff honor the terms of the bonds, which they did. Then, under this indemnity agreement, the Plaintiff did not have to defend the Defendants in any manner to meet the obligations foisted upon it due to the declaration of default, and, under the terms of the bonds, Plaintiff was left with very few options regarding the owner's demands. Unquestionably, the Agreement, which the Defendants agreed to in 1998, gave the Plaintiff the **exclusive** right to settle claims and pursue the completion of the work projects as long as it was done in good faith. To solidify this exclusive right, the Agreement unequivocally states that such determinations by the Plaintiff shall be prima facie evidence of the facts, and that the Plaintiff may take whatever course of action deemed necessary. Nothing that the Defendants have asserted rise to the level of bad faith, fraud or extravagance, and, thus, on this issue has failed to raise a genuine issue of fact. *North Am. v. Montco*, 2003 WL 21383231, at *5. Similarly, the Defendants complain vociferously that they did not owe the subcontractor, Best Paving, $147,509 at the time the Plaintiff assumed responsibility for completing the project.[5]

Within the same context, the Plaintiff's settlement of this subcontractor's claims falls under the authority granted under the Agreement to resolve claims in good faith. More to the point, the Plaintiff hired a consultant to assist them in investigating the reasonableness of the claims of Best Paving and other likewise claims, concluded that they were indeed reasonable and accurate, and paid them.

■ This same provision of the Agreement permits the Plaintiff to settle and accept the sum paid by the Town for the completion of the project even though Defendants note they were owed approximately $382,400. In conjunction with the exclusive right to determine for both parties what and how claims will be paid, the Defendants, by the Agreement, assigned to the surety all rights of the Defendants, including monies due and owing them. With regard to Contract 3P–99 not being bonded and may have been absorbed into Contract 2–99, the Plaintiff nonetheless paid the material claims of approximately $59,846. It is of little particular importance that Contract 3P–99 had no separate identifiable bonds nor the notion that the Plaintiff expended monies on "extra or additional" work. The fact that it was paid in good faith, pursuant to the Plaintiff's express authority to settle such claims, after determining its reasonableness, will render the Defendants liable to the Plaintiff's pursuant to the Agreement. These mentioned steps carried out by the Plaintiff are the only condition precedents which must be considered, completed, and incurred before seeking indemnification. Thus the Defendants' conclusory charge of

SAFECO Insurance Company now is or hereafter becomes a Surety." Dkt. No. 31, Ex. 1.

5. There is correspondence to support the fact that Defendants may have previously acknowledged that they owed Best Paving this sum. In correspondence dated October 4 and

8, 2002, Plaintiff's consultant writes, "[y]ou stated that you were in agreement with the conclusion that Best Paying, Inc. was due $147,509.99 for work performed through September of 2001." Dkt. No. 28, Ex. 1.

negligence, gross incompetence, and misfeasance, by First National when it paid or resolved all of the corresponding claims of this work project holds no sway with the Court nor rises to the level of a deterring us from concluding that no material issue of fact exists in this respect as well.

Defendants' obtuse reasoning suggests that subject matter jurisdiction of this lawsuit is divested by virtue of a provision within the related labor and material bonds, which states that the venue of any litigation as to their terms shall be held in Rensselaer County. As we have made rather evident, this lawsuit does not arise from the material bonds, which exist to protect the owner of the project and the subcontractors, but, directly to the point, comes to the Court solely because of the Indemnity Agreement. In that sense, the Agreement fails to denote any particular venue. The position Defendants take on subject matter jurisdiction is that the indemnification agreement and the performance and material bonds must be read together, or in other words, the Agreement is dependent upon the terms of the bonds.

As a general proposition, two separate written agreements executed at the same time may be considered in law as one agreement but only if the parties intended such a merger of terms and concepts and desired interdependence. *Nat. Union Fire Ins., Co. of Pittsburgh Pa. v. Turtur,* 892 F.2d 199, 204 (2d Cir.1989). Generally, the issues of intent and interdependence are issues of fact ( *Turtur,* 892 F.2d at 204) but such dependency can be decided as a matter of law (*Clarke v. Max Advisors, LLC,* 235 F.Supp.2d 130, 146 (N.D.N.Y.2002)). This doctrine of dependent contracts is not applicable to our case. First, the Indemnity Agreement and the bonds were not entered into contemporaneously and stand more than a year apart.

*Kurz v. United States of Am.,* 156 F.Supp. 99, 104 (S.D.N.Y.1957) (stating the test is flexible and that a finding of being contemporary means being executed substantially at the same time.). Nor was it contemplated that these two separate agreements were to be interdependent except that the event of the contractor's defaulting on the provisions of the bonds triggering the surety to complete the project and pay the corresponding expenses provided the surety with the right to seek indemnification. Defendants' reliance upon *Gen. Ins. Co. of Am. v. Capolino Construction Corp.,* 908 F.Supp. 197 (S.D.N.Y.1995) is misplaced. To make it absolutely certain what are the parties' rights under an indemnification agreement, *General Insurance v. Capolino* advisedly addressed,

the effect of a provision in an indemnity agreement between a surety and a contractor that [which] permitted the surety to recover for expenses incurred in response to an owner's claim under a performance bond whether or not the contractor had actually breached the underlying contract. *See Fidelity & Deposit Co. v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1163 (4th Cir.1983); *BIB Construction Co. v. Fireman's Insur. Co.,* 214 A.D.2d 521, 625 N.Y.S.2d 550, 552–53 (1995); *International Fidelity Insur. Co. v. Spadafina,* 192 A.D.2d 637, 596 N.Y.S.2d 453, 454 (1993). **Each of those cases held that the surety could recover its expenses regardless of whether the contractor was actually in default of the underlying contract, so long as the surety acted in good faith.** The indemnity agreement between Capolino and General is similar: it states that General is entitled to recover expenses incurred in good faith in response to a demand by an owner under a performance bond if the owner has declared Capolino in default. *See*

General Agreement of Indemnity for Contractors, attached as Exhibit 2 to Affidavit of Wendy Ling, dated May, 5, 1995. **Accordingly, as we discussed in our opinion, Capolino may not defeat General's summary judgment motion by arguing that an issue of fact exists concerning whether Capolino was actually in default.**

908 F.Supp. at 199 (emphasis added).

Nonetheless, the *Capolino* court was grappling with the fact that the surety was concerned about the owner's default, and under that circumstance, had to look at the terms of the performance bond. Because of the allegations that the owner was in default, it was unclear that the surety, under that circumstance, was required to complete the construction contracts. Invariably then the court had to look to the performance bonds, and, upon that review, the court discerned that according to the terms of the performance bonds the surety was only required to comply with the owner's demand to complete the project only if there was no owner default. Such was the lingering issue of fact, narrowly defining the breadth of *Capolino*. *Id.* at 199. In that respect, our case is obviously distinguishable inasmuch as there is no allegation of the Town of Schaghticoke defaulting on the construction contract.

Similarly, the Defendants' reliance on *Kurz v. United States* is misapprehended. 156 F.Supp. 99 (S.D.N.Y.1957). In *Kurz*, the court had to deal with provisions in a separation agreement that established a trust and whether the subsequent trust was meant to be revocable or irrevocable. The issue posed was: where the terms of a separation agreement required the execution of a subsequent trust instrument,

must the power of revocation, to be effective, be provided for in the separation agreement or can such a power be valid if it is reserved in the trust instrument. *Id.* at 103. In this regard, the court found the doctrine of dependent contracts applicable. Both instruments were executed within a relative close duration, six weeks, and in order to make the construction of both documents reasonable and effective, they were viewed as forming one single transaction and read together to effectuate the parties intent. *Id.* at 103–04 (citing among others *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197, 36 N.E.2d 106 (1941)). Such an interdependence between separate instruments, was neither intended nor needed here. In the present case, the Plaintiff's right to indemnification, clearly set forth in the Agreement, is not so dependent upon the provisions of the bonds and was not intended to be so. Indubitably, the Plaintiff's right to indemnification, with all of its features, is tightly secured within the Agreement. The only events that needed to occur before Plaintiff could seek indemnity from the Defendants was to incur all related costs in completing the construction project where the Defendants have been declared by the owner to be in default. *Lori–Kay Golf,* 61 N.Y.2d at 723, 472 N.Y.S.2d at 613, 460 N.E.2d 1097 (a surety is legally and equitably entitled to full indemnity against the consequence of a contractor's default); *Int'l Fid. Ins. Co. v. Spadafina,* 192 A.D.2d at 639, 596 N.Y.S.2d 453 (liability under the bonded contract is irrelevant to the contractor's obligation to indemnify the surety). The parties did not intend to look to the material bonds to set the venue for the Plaintiff to pursue the Defendants for reimbursement for the monies expended.[6] *Gen. Ac-*

---

6. The irony of the Defendants' position is that this Court must apply New York law to resolve the issues being considered herein. It is

the same law that a New York State Supreme Court would consider in analyzing whether the Defendants owe the Plaintiff a particular

*cident Ins. Co. v. Merritt–Meridian,* 975 F.Supp. at 517–18 (standing for the proposition that the relationship of surety and contractor is set forth in the indemnification agreement and not the performance bond).

 Defendants further contend that there is no jurisdiction because diversity of citizenship is lacking. 28 U.S.C. § 1332. To support this notion, Defendants' posit that the Plaintiff, who has a "multitude" of agents and representatives operating in New York state and doing a substantial amount of business therein, must be deemed a citizen of New York for the purpose of establishing diversity jurisdiction. Dkt. No. 38, Point II. The only principle the parties will agree upon is that the Second Circuit has recognized two primary tests in terms of determining diversity jurisdiction:

> It is well-settled that there are two general tests that courts apply to determine a corporation's principal place of business and that which test the court should use "depends on the structure and nature of the corporation." *See Peters v. Timespan Comms. Inc.,* No. 97 Civ. 8750(DC), 1999 WL 135231, at *5 (S.D.N.Y.Mar.12, 1999); *see also R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 655 (2d Cir.1979). Under the so-called "nerve-center test," "[w]here corporate operations are spread across numerous states, courts have tended to emphasize those factors that identify the place where overall corporate policy originates" *R.G. Barry Corp.,* 612 F.2d at 655. "[T]he principal place of business of a far-flung corporate enterprise is 'the nerve center from which it radiates out to its constituent parts and from which its officers direct,

control and coordinate all activities without regard to locale, in the furtherance of the corporate objective.'" *Id.* The second test is commonly called the "bulk-of-activities test" or the "place-of-operations test," and is generally used when the corporation's operations are centralized. *See R.G. Barry Corp.,* 612 F.2d at 655. Under this test, courts "deemphasize the concentration on the corporate 'nerve center' and [ ] focus instead upon the state in which a corporation has its most extensive contacts with, or greatest impact on, the general public." *R.G. Barry Corp.,* 612 F.2d at 655.

*Sterling Fifth Assoc. v. Carpentile Corp., Inc.,* 2003 WL 22227960, at *3 (S.D.N.Y. Sept.26, 2003).

Another point the parties will agree upon is that the most appropriate of the two tests this Court should consider is the "nerve center" test. If the Court applies the "nerve center" test as to whether the Plaintiff is an out of state corporation for the purposes of diversity, the Plaintiff has met their burden. Rod Williams, an Assistant Vice President for First National, establishes to the Court's satisfaction that (1) it was incorporated in the state of Washington; (2) its principal place of business is located outside Seattle, Washington and that all of the principal officers of this corporation work in the state of Washington; and (3) all claims, accounting and financial functions, major policy, business and management decisions, research and development, advertising and public relations occur within locations within the state of Washington. Dkt. No. 39, Rod Williams, Aff., dated Jan. 27, 2004, at ¶¶ 2–6; Ex. 1 (certificate of incorporation dated January 1929 and certificate of good stand-

---

sum of money because of an indemnification agreement of which they negotiated and agreed upon. We do wonder what is the utility of and the ulterior motive for raising such a fine jurisdictional point in this case at this time.

ing from the State of Washington). Further, Mr. Williams avers that, even though the Plaintiff uses independent brokers and agents in New York, none have the authority to bind the Plaintiff. *Id.* at ¶ 8. Lastly, the Plaintiff has only one office located in Syracuse, New York, with one employee performing sales and marketing operations and who has no authority to bind the Plaintiff. *Id.* at ¶¶ 7 & 8. All of the above substantiates, pursuant to the "nerve center" test, that the state of Washington is the Plaintiff's location for purposes of diversity. Defendants admit that they are citizens of New York. Axiomatically then, diversity of citizenship has been established, especially in light of the fact that Defendants have not come forward with any facts to refute Mr. Williams' averments, and thus cannot prevail on this point.

 Finally, the Court notes that there does not exist an issue of fact that the Plaintiff cannot collect reasonable attorney fees, costs, and other consulting costs under the Agreement. These types of costs are expected when a surety exercises its exclusive right to seek indemnification. *United States Fid. & Guar. Co. v. Sequip Participacoes,* S.A., 2003 WL 22743430, at \*\*7, 10 & 11 (S.D.N.Y. Nov.19, 2003); *see also Lori–Kay Golf,* 61 N.Y.2d at 723, 472 N.Y.S.2d at 613, 460 N.E.2d 1097 (attorney fees); *Int'l Fid. Ins. Co. v. Spadafina,* 192 A.D.2d at 639, 596 N.Y.S.2d at 455 (citing *Winegrad v. New York Univ. Med. Ctr.,* 64 N.Y.2d 851, 853, 487 N.Y.S.2d 316, 317–18, 476 N.E.2d 642 (N.Y.Ct.App.1985)) (attorney fees and legal costs); *Bank of New York v. Hirschfeld,* 59 A.D.2d 976, 399 N.Y.S.2d 399 (N.Y.App. Div.3d Dep't 1977) (finding entitlement to attorney fees expended in securing reimbursement from obligor). The Plaintiff has well documented each and every expense they have incurred. We have,

therefore, carefully scrutinized all of the Plaintiff's documentation in support of each of the requested fees and expenses and we concluded that they were incurred and reasonable. *See* Dkt. No. 32, Sean P. Kelly, Esq., Aff., dated Oct. 20, 2003. Ironically, the Defendants do not object to these fees as uncollectible, unreasonable, or should "shock the conscience" of the Court. Dkt. No. 34. Therefore, all of the attorney fees, including the fees, to prepare, submit, and defend this Motion, as well as other costs and consulting fees, shall be awarded for a grand total of $20,235. *See supra* note 3.

## CONCLUSION

Defendants fail to raise any factual question whatsoever concerning their obligation to indemnify the surety under the Agreement. Paradoxically, they have acknowledged that obligation. Moreover, Defendants have expressly agreed to unambiguous terms giving the Plaintiff every conceivable right, even by assignments, to even pursue them by litigation in order to be made whole on assuming all of the possible consequences of their default. Dkt. No. 31, Ex. 1 (Indemnity Agreement). Since there is no genuine issue of fact present, but only a question of law, this case can be properly resolved by a summary judgment motion. Defendants' other allegations are equally insufficient to derail a summary judgment against them. Based upon all of the foregoing, it is hereby

**ORDERED,** that the Plaintiff's Motion for Summary Judgment (Dkt. No. 21) is GRANTED in its entirety; and it is further

**ORDERED,** that the Defendants' Cross Motion to Dismiss Amended Complaint (Dkt. No. 37) is DENIED on all grounds; and it is further

ORDERED, that the Clerk of the Court enter a Judgment on behalf of the Plaintiff against all Defendants, jointly and severally, in the amount of $166,870.41, plus any further court costs. Further, Plaintiff shall be entitled to post judgment interest as calculated pursuant to 28 U.S.C. § 1961(a).

IT IS SO ORDERED.