08-2646-cv
Anemone v. MTA

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2008

Argued: June 23, 2009       Decided: January 4, 2011

Docket No. 08-2646-cv

———————————————————

LOUIS R. ANEMONE,

*Plaintiff-Appellant*,

-v.-

METROPOLITAN TRANSPORTATION AUTHORITY, PETER S. KALIKOW, KATHERINE
N. LAPP, GARY J. DELLAVERSON, and MATTHEW D. SANSVERIE,

*Defendants-Appellees*.

———————————————————

Before:   MINER, LIVINGSTON, *Circuit Judges*, and TRAGER, *District Judge*.[*]

Plaintiff-appellant Louis Anemone, the former Director of Security and Deputy Executive

Director for the Metropolitan Transportation Authority ("MTA"), alleges that the MTA and the

individual Defendants in this case (collectively, "Defendants"), took a series of adverse employment

actions against him in response to his protected speech concerning corruption at the MTA, in

violation of his free speech rights under the federal and New York State constitutions. He also

———

[*] The Honorable David G. Trager, Senior Judge of the United States District Court for the
Eastern District of New York, sitting by designation.

alleges that Defendants' conduct violated his due process rights under both the federal and state constitutions. Anemone seeks review of a May 2, 2008, grant of summary judgment in favor of Defendants entered in the Southern District of New York (Loretta A. Preska, *Chief Judge*). Because we conclude (1) that any reasonable jury would have to find that Anemone would have been suspended and then terminated even absent any retaliatory intent on Defendants' part engendered by his allegedly protected speech, such that Defendants are entitled, under *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274 (1977), to a defense to all Anemone's First Amendment claims, and (2) that the district court correctly rejected the procedural due process claims, we affirm.

      Affirmed.

> MATTHEW D. BRINCKERHOFF, Emery Celli Brinckerhoff & Abady LLP, New York, New York (O. Andrew F. Wilson and Elora Mukherjee, *on the brief*), *for Plaintiff-Appellant.*
>
> LOUIS PECHMAN, Berke-Weiss & Pechman LLP, New York, New York, *for Defendant-Appellee Matthew D. Sansverie.*
>
> NEIL H. ABRAMSON, Proskauer Rose LLP, New York, New York (Joshua F. Alloy, *on the brief*), *for Defendants-Appellees Metropolitan Transportation Authority, Peter S. Kalikow, Katherine N. Lapp, and Gary J. Dellaverson.*

LIVINGSTON, *Circuit Judge*:

      Plaintiff-appellant Louis Anemone ("Anemone") was, until May 2003, the Director of Security and a Deputy Executive Director of the Metropolitan Transportation Authority ("MTA"). He alleges that his former employer and the individual MTA Defendants, Peter Kalikow, Katherine

Lapp, Gary Dellaverson, and Matthew Sansverie (collectively, "Defendants"), took a series of adverse employment actions against him, culminating in his termination, as a result of his protected speech highlighting the MTA's perceived failure to address his corruption concerns. He claims that they thereby violated his free speech rights under the federal and New York State constitutions. Anemone also alleges that Defendants' conduct violated his due process rights under both the federal and state constitutions. He appeals from a May 2, 2008, grant of summary judgment in Defendants' favor entered in the Southern District of New York (Loretta A. Preska, *Chief Judge*). Because we conclude (1) that any reasonable jury would have to find that Anemone would have been suspended and then terminated even absent any retaliatory intent on the Defendants' part engendered by his allegedly protected speech, such that Defendants are entitled, under *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274 (1977), to a defense to all Anemone's First Amendment claims, and (2) that the district court correctly rejected the procedural due process claims, we affirm.

## BACKGROUND

### I. Factual Background[1]

Anemone was hired on an at-will basis in December 2001 to serve as the first Director of Security and a Deputy Executive Director of the MTA. In this role, he had overall responsibility for the security of the MTA's infrastructure and the safety of its transportation system. The Chief of Police of the MTA Police Department ("MTA PD") and the security directors of the MTA's various

---

[1] Because of the procedural posture of the case, we view the facts in the light most favorable to the non-moving party. *Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 163 (2d Cir. 2008). Accordingly, the following facts, unless otherwise noted, are undisputed or drawn from Anemone's testimony and, in the event of a dispute, are construed in the light most favorable to Anemone.

operating agencies reported directly to him. Anemone supervised the day-to-day operations of the MTA PD, coordinated security operations of various groups connected with the MTA, and led task forces in assessing threats to the MTA; developing means of mitigating MTA security vulnerabilities; and seeking grants from the Federal Emergency Management Agency to address weaknesses in the MTA's infrastructure. Before taking this position, Anemone had served in the New York Police Department ("NYPD") for 35 years, becoming the Chief of Department before retiring in 1999. As Director of Security of the MTA, Anemone was expected to and did cooperate with various investigatory agencies, including the Manhattan and Queens District Attorneys' offices and the MTA's Office of the Inspector General ("OIG"). Although the parties dispute the extent to which press relations constituted a part of Anemone's responsibilities, Anemone contends that he spoke with the press only if directed by Katherine Lapp, the MTA's Executive Director, or Peter Kalikow, its Chairman.

Subsequent to Anemone's hiring, Nicholas Casale was hired as Deputy Director of Security for the MTA, reporting directly to Anemone. Casale had previously worked for Anemone in the NYPD and was recruited by him to join the MTA. While at the MTA, Casale and Anemone together created the Joint Infrastructure Task Force ("JITF"), a subdivision of Anemone's operations, to spearhead the MTA's efforts to secure its infrastructure from terrorist threats.

Before the events at issue here, both Anemone and Casale had been involved in conducting corruption investigations at the MTA.[2] The first such investigation arose when Anemone discovered

_____

[2] As the district court noted, the connection between these investigations and Anemone's and Casale's official positions with the MTA is not clear from the record, beyond Anemone's description of these inquiries as "security-bolstering investigative efforts." *See Anemone v.*

4

that several MTA contractors were submitting "inflated and unreasonable bills" for their work for the MTA. With Casale, and in consultation with Gary Dellaverson, the MTA's Director of Labor Relations and a fellow Deputy Executive Director, Anemone began investigating these billing practices and discovered evidence of fraud on the part of the contractors Geller Alarms and I-Lite Electric. Anemone briefed his superior, Lapp, on his findings and on the potential involvement of at least two MTA employees. Together, they decided to refer the matter to the Manhattan District Attorney's office ("Manhattan DA's office"), which then opened its own investigation. Around the same time, Anemone also began an investigation of another contractor, Figliolia Plumbing, based on a tip from Dellaverson. The investigations ultimately resulted in guilty pleas by the MTA employees involved and the payment by I-Lite Electric and Figliolia Plumbing of substantial restitution to the MTA. *See Anemone  v. Metro. Transp. Auth.*, No. 05 Civ. 3170, 2008 WL 1956284, at *2 (S.D.N.Y. May 2, 2008).

Based in part, although certainly not exclusively, on his conduct during these corruption investigations, Anemone's deputy, Casale, engendered a series of complaints. These included a complaint to Lapp from an Assistant District Attorney in the Manhattan DA's office that during the I-Lite investigation Casale "was undertaking his own investigation, in direct contravention to what their [office's] investigation was." Lapp Dep. at 124. Lapp, who herself had extensive criminal justice experience prior to joining the MTA, indicated that this complaint raised "serious concerns" and she "did not have the [level] of comfort that [Anemone] was supervising [Casale] as closely as [she] might want." *Id.* at 170. Kalikow had also complained directly to Anemone that Casale was

*Metro. Transp. Auth.*, No. 05 Civ. 3170, 2008 WL 1956284, at *2 n.6 (S.D.N.Y. May 2, 2008).

5

like "a bull in a china shop" and had requested that Anemone fire him, although Kalikow had been dissuaded from this position at that time. Anemone Dep. at 77–78. There had also been complaints from the MTA Police Benevolent Association and from an Assistant General Counsel for the MTA. Finally, Dellaverson asserted that a number of people had complained to him "that Anemone was in essence tolerating this seriously bullshit, gross, abusive behavior on Casale's part at virtually every turn." Dellaverson Dep. at 220. Anemone has acknowledged both that he received complaints from various sources and that Casale "was very rough around the edges." Anemone Dep. at 68. He has also admitted that he did not conduct any further inquiry into the complaints but instead defended his deputy, stating to Kalikow, for example, that Casale "wasn't hired to make friends." *Id.* at 77.

The instant controversy arose out of several conversations alleged to have taken place among Dellaverson, Anemone, and Casale regarding the outgoing president of the Long Island Rail Road ("LIRR"), Ken Bauer. According to Anemone, Dellaverson told Anemone and Casale that Bauer was a "bad guy" and that it was "surprising to him" that they had not come across any corruption involving Bauer. *Id.* at 103, 105. In one conversation, occurring in late 2002 or early 2003, Dellaverson mentioned a company called Plasser American ("Plasser"), which supplied special track maintenance railroad cars to the LIRR. At some point, "because Bauer had [also] been mentioned," Anemone understood Dellaverson to be "leading [Anemone and Casale] to Plasser," *id.* at 114, although he could not recall Dellaverson specifically attributing wrongdoing to Plasser or stating that there was any connection with Bauer. Dellaverson never asked for the information he provided to be kept confidential, although Anemone asserts that he and Casale understood this to be Dellaverson's desire.

6

Around the same time as the conversation in which Dellaverson allegedly suggested a relationship between Bauer and Plasser, in mid-January 2003, Anemone had a dispute with Lapp, his superior, regarding another investigation undertaken by Anemone and Casale into possible problems in the billing practices of John Wood, an outside attorney used by the MTA. Without Lapp's knowledge or approval, Casale had requested Wood's billing records. Lapp, angered by this request, told Anemone in response that "she would be the determining factor in any future investigations" by the JITF. She threatened "drastic action" if she was not able to "determine the avenues of investigation that would be pursued," *id.* at 46–47, and instructed Anemone to clear future investigative steps with her. Anemone, who was "insulted" by this conversation, prepared a letter of resignation but was ultimately talked out of submitting it by Dellaverson.

Meanwhile, as a result of his earlier conversation with Dellaverson, Anemone told Casale to "continue . . . or begin nosing around" the Bauer-Plasser relationship. *Id.* at 149. This subsequent investigation led Casale to Joseph Trimarchi, Bauer's former driver, who had been subsequently assigned to Anemone's and Casale's task force. According to Anemone, Trimarchi told Casale that Plasser had "wined and dined" Bauer and that Trimarchi had driven Bauer to the airport for a flight to Austria for which Plasser paid and to the Waldorf-Astoria for another Plasser-related event. Casale formally commenced an investigation into the allegations regarding Bauer and Plasser on February 11, 2003. Anemone thereafter directed Casale to contact the Queens District Attorney's office ("Queens DA's office") about the investigation, not informing Lapp in spite of her January directive. Casale first contacted the Queens DA's office in mid-February.

On February 25 or 26, just days before an impending MTA board meeting, Anemone

7

belatedly informed Lapp of the Bauer/Plasser investigation. Specifically, he informed Lapp that "[Casale] and the people at [the JITF] had allegations that Bauer had been wined and dined by the Plasser Corporation and . . . that there was a small contract with Plasser that was to be voted on on Thursday at the board meeting." App. at 678. He has subsequently admitted he may have used the term "confidential informant" in this conversation with Lapp — hence suggesting that the information came from such a source; however, Anemone has also claimed that he may have used the word "source" instead. According to Lapp, upon hearing of the Bauer/Plasser allegations, she instructed Anemone to cease his investigation, because she was going to refer the matter to the OIG, the agency authorized to investigate allegations of misconduct by MTA officials. Anemone took the direction as "somewhat of an insult." Anemone Dep. at 162. On February 27, the MTA Board of Directors had a public meeting, and the contract between Plasser and the LIRR that Anemone had flagged was taken off the agenda. In explaining this move, Kalikow asserted that there had been "an impropriety alleged against the president of the Long Island Rail Road for receiving gifts from the Plasser Corp." App. at 980.13. The matter was reported in the press the following day.

Anemone understood that Lapp was not authorizing him to continue the Bauer/Plasser investigation — that he had argued that the investigation should stay with the JITF, and that he had lost. He has admitted specifically "that during the February 26 meeting, Katherine Lapp instructed [him] to cease the investigation of Mr. Bauer's contacts with Plasser American" because "she planned to refer the investigation to the MTA inspector general's office." Anemone Dep. at 352. Anemone conveyed the conversation with Lapp to Casale, telling him that "[they] were out." *Id.* at 173. Anemone nevertheless "thought it was okay for [Casale] to continue the investigation," *id.* at

8

353, stating in testimony in a separate proceeding brought by Casale that he told Casale after the board meeting that he "thought it was a good idea that he contact again or visit the Queens DA's office," App. at 1397. He has agreed that "it's fair to say, at least from Casale's perspective, [Casale] had [Anemone's] authority to go to the Queens DA . . . ." Anemone Dep. at 179. He stated that although he thought "nobody would object to a law enforcement official of the Queens DA['s] stature being informed," he did not tell Lapp because he was "upset" and "didn't think this was a good decision she was making." *Id.* at 354. He feared she would halt the investigation because she had indicated that she wanted the OIG to handle it, and he "had no confidence at this point in the inspector general's capabilities or his integrity into following these leads" and "had doubts about Ms. Lapp's ability to follow these leads wherever they led." *Id.* at 355.

Lapp did indeed refer the investigation to the OIG and, on February 27, Maura Daly, a Senior Investigative Attorney with the OIG, spoke with Anemone about the matter. According to Daly, Anemone told her that Casale was the source of the allegation regarding Bauer and Plasser and that there was a "confidential informant," or "CI" involved. Anemone disputes whether he ever stated to Daly that there was a confidential informant. However, in a March 2003 deposition before the MTA ("March 2003 deposition"), Anemone agreed with Daly that "[d]uring the course of that conversation [he] told [her] that Nicholas Casale was the source of the allegation and that he had a confidential informant" and that he "*might* have use[d] that word with" her. App. at 672–73 (emphasis added). Anemone further testified that he believed at the time that a "confidential

9

informant" existed and that it was Trimarchi, Dellaverson, or possibly someone else.[3] When Daly asked to speak to Casale, Anemone indicated he thought there might be a "conflict of interest" because he thought the OIG was investigating Casale in an unrelated matter. Anemone Dep. at 196. In his March 2003 deposition, Anemone stated that he may also have been referring to the concern that "[Casale] didn't want to reveal the names of his community sources," and that he perhaps improperly termed this concern a "conflict of interest." App. at 673.

Nevertheless, on February 28, Casale spoke with Nick Kapur, the Deputy Inspector General at the OIG. Casale confirmed that he had a "source" in the Bauer/Plasser investigation and that his source was a citizen of the United States and a resident of New York. Casale also claimed there might be a "conflict of interest" with the OIG handling the case. Despite assurances that his source's confidentiality would be protected, Casale refused to give Kapur the identity of his source. According to Anemone's March 2003 deposition, he "did not direct [Casale] to cooperate immediately and [he] did not direct [Casale] not to cooperate." App. at 697. Anemone also did not himself disclose the source of Casale's information to the OIG. Daly testified that the OIG thought the existence of a CI meant there was significant information they were not getting, while Matthew Sansverie, the Inspector General, asserted that he thought it meant the source had something more

_____

[3] Anemone has disputed whether there is any one accepted definition of "confidential informant," although he has also agreed that using the term "community source" with Daly would have been "more correct." *Id.* at 676. Defendants assert that a "confidential informant" refers specifically to someone who is providing information to a law enforcement agency, who is registered with that agency, and who has requested confidentiality. According to Anemone, a "community source," in contrast, refers to someone who in the course of conversation with an investigator might supply information either unwittingly or without being conscious of the fact that the information might be used in a criminal investigation.

than "an allegation as [barebones] as wining and dining," Sansverie Dep. at 195.

With Anemone's knowledge and permission, Casale met with the Queens DA's office the very same day he spoke with Kapur. At the meeting, he indicated that he "had a source of information at the highest level of the MTA, and [that] this source had been proven correct prior." Casale Dep. at 91. He later testified that "I don't believe I ever used, quote, confidential informant, close quote, confidential informant referring to Gary Dellaverson to the Queens district attorney at any time." *Id.* On March 3, Casale spoke with Stephen Spahr, the OIG First Deputy Inspector General, and other members of the OIG staff. Casale claimed his source was "very upset" that Kalikow had revealed the investigation at the February 27 board meeting "and refused to come forward." *Id.* at 140.[4] Spahr again assured him that the source's confidentiality would be preserved and that the OIG would be satisfied for the moment to know the CI's evidence without his identity being revealed. According to a memorandum made by the OIG of this conversation, Casale nonetheless said he had no specifics and suggested that the OIG contact the Amtrak OIG regarding an earlier case involving Plasser.

At this point, Lapp asked Anemone to have Casale cooperate and identify the source. Anemone did not identify Dellaverson at that point, but instead told *Dellaverson* as well as Lapp that there was a "confidential informant." Anemone now contends that, at the time, he thought both Dellaverson and Trimarchi, "and possibly others unknown to him," were the "source of

---

[4] Anemone has acknowledged that he was aware that Casale made this statement and has conceded that Casale may have made it based not on a conversation with Dellaverson but rather on his own "surmising." Anemone Dep. at 215. When pressed as to whether such behavior from his deputy was acceptable, Anemone stated that in some situations a "white lie" may be appropriate, stating that "our lives . . . are filled with those little deceptions." *Id.* at 221.

11

information." App. at 980.52. Anemone also "let [Casale] know [Lapp] is furious." He told Casale that he was "trying to fend her off, keep him in the game," but that he needed "something to answer her." *Id.* at 1410. On March 3, Casale wrote an email to Anemone stating: "Director, Confidential community source refuses further interviews and registration. Source's initial allegation involved Mr. Bauer being wined and dined by Plasser officials. Source states that the records are still available. Submitted for your information." *Id.* at 220. Anemone forwarded the email to Lapp the same day, adding "No luck with the source coming forward. Suggest the IG continue the investigation." *Id.* at 221. Anemone has admitted that this email was an attempt to create the impression that he was cooperating with the OIG, as Lapp had directed, while not in fact cooperating and still hiding the source's identity. *Id.* at 1499.

According to Casale, the "source" mentioned in his email to Anemone was Dellaverson. Anemone claims that this was also his understanding, that it referred either to Dellaverson or Trimarchi, and that he had asked Casale to go to Dellaverson to see if he would go to the Queens DA's office to be registered. In response to the question, "Did Mr. Dellaverson refuse further interviews?" (as alleged in Casale's email), Casale claimed, "What I'm saying here is that Mr. Dellaverson did not want at that time to discuss any further in coming forward as the community source of all my information." Casale Dep. at 107. Casale conceded that he had not asked Dellaverson whether he would be registered and testified that he had written that Dellaverson refused registration "[b]ecause I was conveying to Chief Anemone the fact that I thought we were out of time and that it was — it was imminent that Mr. Dellaverson would be exposed as the source of the information." *Id.* at 114.

12

Anemone has agreed that neither Dellaverson nor Trimarchi would have been registered even if their identities had been disclosed, because they were not confidential informants. Anemone claims now that it was possible that Dellaverson might have been registered and that it would not have been a "significant event" if Casale had registered him or Trimarchi. Anemone Dep. at 389. He has acknowledged that the difference between a community source and a confidential informant is that "[a] confidential informant would be somebody registered," *id.* at 431, but claims Casale "used the term community source in his conversations with me, and he used the name Gary [Dellaverson] in conversations with me," *id.* at 432–33. He has also conceded that he knew Lapp was seeking to have Casale reveal the identity of his source, that she had asked him to "[h]ave [Casale] cooperate, identify the source," and that, despite his own knowledge that the source was Dellaverson, he "wasn't about to expose him." Anemone Dep. at 135. Critically, Anemone has admitted that he did not do so despite Lapp's repeated requests, because "I told her what I thought she needed to know and nothing more. . . . I had lost trust in [Lapp]. I had lost trust in the chairman of the MTA, Mr. Kalikow." *Id.* at 392.

The OIG, which was frustrated by Casale's unwillingness to name his informant, announced that it was going to take the unusual step of seeking a subpoena of Casale, stating that "[g]iven the gravity of the allegation and the public scrutiny already accorded this question it is clearly unacceptable that HQ staff would withhold information critical to moving ahead with an expeditious inquiry into the allegation." App. at 202. On March 4, Sansverie sent an email directing his staff to ask Casale "how he did (or did not)[ ]comply with the regs of his department in dealing with confidential informants," adding that "[h]opefully, this was not some reckless allegation made out

13

of Casale's or Anemone's dislike for Bauer, which feeling may be mutual. . . . We are conducting a police corruption investigation as well as a run down of the 'allegations' against Bauer." App. at 205. On the same day, Casale, according to the testimony of Jack Ryan, the Chief Assistant District Attorney for the County of Queens, sent two JITF detectives, Trimarchi and Alex Rubino, to the Queens DA's office to discuss the investigation, even though "they really didn't know much more." Ryan Dep. at 24. As Ryan described the information they provided, "we didn't know if there was any there there." *Id.* at 59. They had only press clippings on Bauer, and Rubino specifically stated there was no confidential informant. Trimarchi similarly recalled not understanding why he was directed to meet with Ryan and felt it was "kind of embarrassing," because he was just Bauer's driver and "there was nothing to say." Trimarchi Dep. at 104.

Anemone and Casale also spoke to Ryan together on March 4 by phone. At no time during this conversation did Anemone indicate that his task force was no longer investigating the matter. He has testified that he himself "used that phrase, [confidential informant,] . . . in that discussion on the speaker phone. I think I did any way. I don't know." App. at 708. He agreed "that [he had] advised Mr. Ryan or Mr. Mansfield [also with the Queens DA's office] that Mr. Casale would attempt to convince a confidential informant to cooperate with their office." *Id.* Anemone testified in this litigation that Ryan "may have used the term CI," and that "[w]hen [Ryan] said is there a CI," either he or Casale responded "Yes." Anemone Dep. at 434. Anemone claims now that "[h]ad I known that we'd been sitting here now three years later and that letting that term slide as easily as I did during that conversation, I certainly would have corrected him at that point." *Id.* at 435. Ryan himself testified affirmatively that Anemone "told me there was a CI." Ryan Dep. at 97.

14

During this March 4 conversation, Casale was asked for the name of the source, but he refused to provide it. He claimed his source was "in the wind." Casale Dep. at 151. Ryan stated that Casale told him that "[Casale] spent the weekend with [his source] and was trying to talk the guy in." Ryan Dep. at 82. While Casale later claimed he "d[idn't] recall" whether he told anyone he "spent the weekend trying to convince the source to come forward," he has acknowledged that he "was never with . . . Dellaverson," the individual he now identifies as this source. App. at 1578. During the call, Anemone also told Ryan that bringing the case to Queens was "probably premature" and that he wanted to "rethink it." Anemone Dep. at 236. According to Ryan, Casale asked him not to tell Lapp that Casale had gone to see the Queens DA, asserting that he would be fired if Ryan did, with Casale acknowledging he "may have asked Mr. Ryan not to tell Mrs. Lapp that [he] was there." Casale Dep. at 144. Ryan subsequently asked Anemone to call him later in the day.

Coincidentally, Lapp called Ryan around the same time for advice on dealing with Casale. In talking with her, it was clear to Ryan that Lapp did not know Casale and Anemone had contacted the Queens DA's office on the Bauer/Plasser matter. When he later talked to Anemone, he asked Anemone to "please call [Lapp] and tell her before I have to call her and tell her." Anemone Dep. at 239. Ryan testified that "[Anemone] said something to me to the effect that [Casale] had spent the weekend trying to talk the CI in and that he hoped that he would have him by the following Friday." Ryan Dep. at 16. Ryan also stated that he did not believe that Casale had a CI and asked Anemone if there was an informant. Ryan testified "I also told him it didn't really matter if there was a CI, to just tell us that there isn't one. We don't need a CI to investigate, we can go forward, but we can't be chasing our tails thinking there's a CI when there's not one . . . ." *Id.* at 17.

15

Anemone stated that "I thought I set him straight when I told him yes, there is." Anemone Dep. at 241.[5] According to Anemone, "it was clear that [Ryan] had doubts" as to the existence of a confidential informant. *Id.* at 241. Ryan was also aware that the OIG was seeking to compel Casale's testimony and warned Anemone "don't let [Casale] perjure himself." Ryan Dep. at 17.

That afternoon of March 4, Casale was formally subpoenaed by the OIG. According to both Spahr and Daly, it was the only time they could recall issuing a subpoena for an MTA employee. Anemone contacted the MTA General Counsel's office to try to quash the subpoena. He also went to Dellaverson for help, and has admitted that in doing so, he did not indicate to Dellaverson that he was trying to protect him, but rather suggested that there was another source. Anemone, while he claimed that he told Casale to be truthful, also admitted that he understood Casale was trying to avoid being deposed.

On March 5, after the pressure from Ryan, Anemone finally advised Lapp that he had been to the Queens DA's office, and she "reacted in a very forceful and angry manner." Anemone Dep. at 260. Lapp recalls Anemone defending his actions on the ground that he and Casale "had a CI," and that "they went to the Queens DA's office to help them get the CI to come forward." Lapp Dep. at 165. Lapp told Anemone that Casale had to appear before the OIG for the deposition, that failure to do so would result in disciplinary action, and she directed him to require Casale to cooperate with the OIG. Anemone did not order Casale to appear, although he testified it was his understanding that Casale was going to appear.

On March 7, Anemone had lunch with Casale and Dellaverson. Dellaverson, who, according

---

[5] Anemone claims that he said they had a "source" rather than a CI. *Id.* at 240.

16

to his testimony, had no idea that he was the supposed "source" of the Bauer/Plasser allegations, sought to "enlist[] Anemone's support to . . . secure [Casale's] cooperation with the Inspector General," and to "secure [Casale's] exit from the organization . . . in a way that didn't exacerbate what damage had already been done." Dellaverson Dep. at 288–89. At this meeting, it was clear to Anemone that Casale's job was in jeopardy. Casale subsequently requested and Anemone authorized a "medical leave." Despite Dellaverson's efforts, Casale failed to appear at the OIG on March 10, as his subpoena required, after which Sansverie sent an email to Dellaverson asking if Casale was on some kind of leave. In a later email that same day, Sansverie made clear to Dellaverson his concern that the request for medical leave was fabricated, as it coincided so closely with the date on which Casale was required by subpoena to come in for an interview. Lapp again directed Anemone to advise Casale he was expected to cooperate with the OIG, with Anemone communicating the order to his deputy but not himself ordering Casale's appearance before the OIG.

On March 11, Sansverie met with Ryan and the Queens DA's staff, at which time Ryan indicated to Sansverie as well that he did not believe there was in fact a CI. Sansverie emailed Lapp after the meeting with the Queens DA's office, notifying her that Casale had contacted the DA's office well after the OIG had been given responsibility for the investigation, adding that "it smacks of insubordination if someone high in the PD knew I was taking it over and they went to Queens DA anyway three days later. . . . [I]n my opinion it was an armed coup at Headquarters." App. at 216. When Lapp responded by asking Sansverie if he knew when Anemone had first spoken to the Queens DA's office, Sansverie wrote:

> First, I'm going to assume, unless I learn otherwise from you, that you told [Anemone] at that Tuesday meeting that you would be asking the IG to investigate

17

this matter, not the PD. (Did you by any chance get explicit with him and advise him to cease and desist whatever he was doing and bring it to me?)

Second, my recollection from what I heard yesterday was that the next conversation between Casale and/or [Anemone] and Queens occurred on Feb. 28th or later. . . . [W]hile Casale called perhaps a week before the LIRR Committee meeting to report he had "something big," . . . Queens reports no further contact on the matter until Feb. 28th when Nick produced his "evidence" at the Queens DA's Office.

*Id.* at 217.

On March 12, Sansverie emailed Dellaverson to advise him that he would be making a motion to compel Casale's participation in the OIG deposition. Sensing that Casale's Anemone-approved "medical leave" might be illegitimate, Sansverie added that if the OIG found evidence that this was the case, it would demand "swift and final administrative action." *Id.* at 206. On March 26, Casale belatedly appeared for his deposition, at which time he finally named Dellaverson as the "source" that had prompted the investigation into Plasser and noted that Trimarchi provided some additional information. The same day, Dellaverson was also deposed by the OIG. He testified that he was not a confidential informant, nor had he ever been offered status as such.[6] Anemone claims, however, that after Dellaverson's deposition, Dellaverson said to him "I didn't appreciate that Nick identified me as the source." Anemone Dep. at 148.

On March 27, Anemone was himself deposed by the OIG. Anemone testified that he may have advised Lapp and Dellaverson that a "confidential informant" existed,[7] and agreed he might

---

[6] Dellaverson later testified that he did not recall and did not believe that he ever said anything to Anemone or Casale that would have led a reasonable person to conclude that he believed Bauer was involved in ethical violations or crimes. Anemone disputes this testimony, however, and we have thus credited his version of events.

[7] Anemone has since conceded that he used the term with both.

18

have used the word with Daly as well. He also conceded that he used the term with the Queens DA's office. Anemone now admits that "[t]here was no confidential informant as it is used in common police parlance." Anemone Dep. at 311. Casale was even more definitive, stating that "Mr. Dellaverson was never a confidential informant. . . . It's mind boggling to believe that you would want to make the No. 2 man of the MTA into a confidential informant, which some drug dealer becomes because he's receiving a benefit." Casale Dep. at 271. Anemone's "take-away" from the deposition was that the OIG had an "interest in nailing [Casale] and/or [him]," Anemone Dep. at 369, and "[w]hether or not [he] was going to be employed in the future was in the back of [his] head," *id.* at 363. When he completed his deposition, while he "didn't believe [he was going to be terminated]," he "assumed that it . . . could be a possibility." *Id.* at 364.

On the afternoon of March 28, the day after Anemone's deposition at the OIG, Anemone and Casale went to the *New York Times*' offices to meet with two reporters, Randy Kennedy and Bruce Lambert. Anemone did so, he now claims, because he believed that "the only hope was to raise the governor's interest in this issue, . . . not through his political appointed or elected officials, but through the medium of using the press to tell our story." *Id.* at 299. He did not take the direct action of calling Governor Pataki, even though the pair knew each other, because Anemone "felt the press of time." *Id.* at 362. Moreover, Anemone felt that it was part of his "job duties" to go to the *New York Times* under these circumstances, albeit as the "last option available." *Id.* at 304. However, he also testified that he thought he "was terminated because [he] went to The Times as a citizen whose duty it was to alert . . . the people in the city and the state of the dangers posed by an agency almost out of control . . . ." *Id.* at 320. Casale testified that at the time he and Anemone went to the

19

newspaper, he "believe[d] that it was clear that at the very least they would terminate me." Casale Dep. at 207.

The reporters began to put together a front page story that would appear on the *Times* website on March 29 and appear in print the following day. In it, Anemone and Casale contended that top-level MTA officials were frustrating corruption investigations. The article, highlighting the "extraordinary rift" Anemone's allegations represented, stated that Anemone and Casale "had made the highly unusual decision to speak publicly about the allegations," but "as a last resort, after trying repeatedly to work through internal channels." App. at 228–29. Beyond his allegations of obstructed corruption investigations, Anemone explicitly connected his corruption claims to his role as the MTA's Director of Security, stating that the corruption he identified "threaten[ed] to undermine efforts to protect the transit system from terrorism" and "le[ft] the agency vulnerable because many of [the allegedly corrupt contractors] have access to information like blueprints and security plans." *Id.* He charged that his investigative efforts were being repeatedly impeded by MTA officials and that in his situation, "[t]ypically, [he] would resign, but if [he's] out, [he] can't help them." *Id.* at 229.

Dellaverson, Lapp, and Sansverie all became aware of the article's publication on March 29, when it first appeared online. Between March 30 and March 31, Sansverie drafted the Interim Report, a report on the OIG's inquiry into the Bauer/Plasser allegations and the alleged obstruction of that inquiry by Anemone and Casale. The Report issued on March 31, a Sunday. While Sansverie acknowledged that it was unusual for the MTA to issue an interim report in an employee misconduct context and for him to come in on a Sunday to draft it, he noted several reasons for issuing the

20

Report when he did. First, the timing reflected to some degree the conclusion of the OIG's investigation, since Anemone's and Casale's depositions had both concluded by March 28. Second, the rushed drafting also reflected the exigency imposed by his loss of trust in Anemone and Casale. According to Sansverie, Anemone's lack of cooperation with the OIG, the "significant lack of candor," and his "failure to provide direction" of Casale all contributed to a situation of perceived exigency. Sansverie Dep. at 116. Third, and relatedly, a public, and in Sansverie's mind incorrect, account of Anemone's actions within the MTA had now been published in the *New York Times*. While the Report closely followed on the heels of the *Times* story, however, no party disputes that significant portions of it were drafted *before* the *Times* article appeared.

The facts section of the Report largely mirrored the account outlined here. It focused on Anemone's claim that Casale had a "confidential informant," an informant the Report concluded did not in fact exist. The Report highlighted the difficulties the OIG experienced in getting Casale and Anemone to cooperate. In addition, it reported the visits by JITF detectives to the Queens DA in early March, as well as Anemone's own conversations with Ryan, and closed by chronicling the testimony given by Casale and Anemone to the OIG at the end of March.

With respect to the Bauer/Plasser investigation, the Report noted that Anemone's and Casale's actions "evince[d] a grave deviation from acceptable practices by two high ranking MTA officials charged with the most sensitive of duties in th[is] post September 11 era." App. at 213. It concluded they had "fabricat[ed] a confidential informant in order to accuse the former President of the LIRR of misconduct," and that their "subsequent actions . . . are replete with obstruction, half-truths and outright misrepresentations made to avoid admitting their wrongdoing." *Id.* With

21

respect to the confidential informant, it noted that both Anemone and Casale had admitted there was never any such "confidential informant." While Anemone claimed he had made a "mistake," the Report suggested that, given Anemone's experience as a police officer, the "enormity of such a 'mistake' and the lack of good faith exhibited by Anemone in making such a ludicrous claim are evident." *Id.* The Report highlighted Anemone's and Casale's decision to go to the Queens DA's office rather than cooperate with the OIG. Overall, it concluded that the two had engaged in "police misconduct of the highest order, contriving a non-existent informant and using such an ugly device to accuse an individual of specific wrongdoing without evidence." *Id.* at 214. It stated that "within days of making the damning admission [in their depositions] that there never was a confidential informant, Mr. Casale and Mr. Anemone took desperate action, attempting to cloak themselves in the garb of whistleblower before the MTA could take action against them for this misconduct." *Id.*

> The Interim Report concluded by stating that:

> Anemone's and Casale's willingness to fabricate an informant and their repeated, affirmative attempts to induce individuals to believe that there was specific evidence against Ken Bauer when there was none should be more than enough basis for their termination. Given the critical nature of the security of the MTA and the need for complete confidence in the methods of those entrusted with preserving it, such acts perpetrated by the Director and Deputy Director of Security undermine the confidence of all who must deal with them. Anemone and Casale have traded on their credibility, and, having lost it, can no longer command the respect or trust of those they supervise or report to.

*Id.* at 215.

Queens District Attorney Richard A. Brown also issued a public statement when the Interim Report was released, noting that his office had attempted to investigate the allegations brought to it by Casale, but that despite both Anemone's and Casale's assurances that there was a confidential

informant, both Anemone and Casale had now acknowledged no such informant existed. He added that he was "disappointed — and, quite frankly, somewhat bewildered" by Anemone's and Casale's actions. App. at 230.

After receiving the Interim Report, Dellaverson decided to put Anemone on administrative leave, while giving him an opportunity to respond to the Report. According to Dellaverson, because Anemone had used the term "confidential informant" specifically with him, he knew that aspect of the report to be factual and so was particularly struck by "the report's conclusion [that] no such confidential informant existed." Dellaverson Dep. at 235. With respect to the *Times* story, Dellaverson stated that it "had nothing to do with [his] decision to place either [Anemone or Casale] under administrative leave." *Id.* at 248. He acknowledged, however, that Anemone's exercise of "no judgment" in making "baseless allegations against his employer in the New York Times . . . and his connection of those baseless allegations to an assertion that placed MTA customers at risk" did influence his subsequent decision to fire Anemone. *Id.*

Despite his suspended status, on April 11, 2003, Anemone appeared before the New York State Assembly Standing Committee on Corporations, Authorities, and Commissions, speaking as "Director of Security of MTA." His testimony outlined his concerns with the past investigative efforts of the OIG and complained that he had now been made the target of an OIG investigation for no legitimate reason. He claimed that his concerns about corruption were connected to his position as Director of Security at the MTA because corrupted officials can be blackmailed by third parties and terrorists, thereby becoming security threats: "We can't secure the MTA unless we have the absolute confidence in the people that are working for us." App. at 180.

23

About one week later, on April 18, 2003, Sansverie sent a letter to Kalikow expressing his concern with Anemone's and Casale's conduct in another area. Anemone and Casale had created a Counter Terrorism Advisory Board ("CTAB"), ostensibly to provide expertise to the JITF in a variety of areas. However, appointees included, among others, a urologist who was friends with both Casale and Anemone, Casale's landlord, a securities trader and horse breeder who had socialized with Anemone, and a retired corporate financial officer who had also socialized with Anemone and served with him on a hospital board of directors. While the CTAB had never met, its members were given police-style badges and parking placards. Sansverie's letter to Kalikow highlighted "Anemone's and Casale's cavalier attitude toward the proper formation of such a board, . . . the number of misrepresentations they made about the board . . . [and their] actions in providing Police Department identification cards, parking placards and badges . . . without as much as a background check (or further MTA approval) . . . ." *Id.* at 241. He concluded that "[t]he board's actual membership completely belies its august sounding role and betrays the fact that, despite claims made to the public and the law enforcement community, there was no board of experts behind Anemone's and Casale's moves." *Id.*

Anemone was terminated on May 8, 2003, as he was advised in a letter from Dellaverson, to whom the decision had been delegated by Lapp. The letter stated, "I am writing to advise you that, based on my careful review of the information in my possession and known to me, your employment as Deputy Executive Director/Director of Security is being terminated because of your failure to perform the duties and responsibilities of your position in a satisfactory manner, including your failure to properly supervise the Deputy Director of Security." App. at 250. Dellaverson has

24

stated that the decision "was predicated upon any number of things," including the Interim Report, Dellaverson's and Lapp's "loss of . . . confidence" in Anemone, "his failure to follow [Lapp's] direction, his failure to supervise Mr. Casale," and finally, Anemone's "decision and . . . lack of any discretion," not in speaking to the *Times*, "but in what he spoke to The New York Times and the baseless allegations that he made against his company." Dellaverson Dep. at 253. Lapp concurred that termination was appropriate based on "a variety of factors," including "receiving . . . complaints about his staff, i.e., Mr. Casale,"Lapp Dep. at 91, the fact that Anemone and Casale, despite her directions, "brought the matter to the Queens District Attorney office without [her] knowledge," *id.* at 94, the claim about the existence of a confidential informant that both the OIG and the Queens DA's office had found not to be accurate, and Anemone's "misjudgments or questions about judgment, and the failure to take direction," *id.* at 95.

On September 10, 2003, the OIG submitted a final report on the Bauer/Plasser investigation, finding that Bauer had been entertained five times by Plasser but concluding that the meals did not establish a quid pro quo relationship with respect to Plasser's contract with the MTA, because the Plasser contract was a "sole source procurement" for a certain machine that only Plasser makes, the contract price was negotiated down significantly, and Bauer was not involved in procurement. Bauer was ultimately found to have committed ethics violations, with the findings reported in a press release on December 5, 2003.

While both Anemone and Casale were entitled to avail themselves of a "name-clearing"

25

hearing in a proceeding under New York's Article 78, only Casale did.[8] On November 6, 2007, Hearing Officer Kenneth Feinberg issued his decision in that matter. He concluded that Casale "failed to prove by a preponderance of the evidence that the statement that he was dishonest in connection with the Plasser American matter is false." Casale v. MTA, Index No. 115718/03 (SKH), at 3 (N.Y. Sup. Ct. Nov. 5, 2007) (Name-Clearing Opinion). Instead, "Casale's own testimony demonstrates that in his dogged pursuit of this goal [of investigating potential corruption in the MTA] he violated directives from Katherine Lapp, the Executive Director of the MTA, concealed these violations from Lapp, the Queens DA and the OIG, and obstructed the investigation of the OIG." *Id.*

## II. Procedural History

As noted, Anemone did not choose to avail himself of an Article 78 name-clearing hearing. Instead, he filed his complaint in the instant action on March 24, 2005, asserting that the MTA and the individual Defendants took a number of adverse employment actions in retaliation for First Amendment-protected activity exposing corruption at the MTA, in violation of 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution, as well as provisions of the New York State Constitution. He further asserted that, based on the manner in which he was suspended and then fired and on the release of allegedly defamatory statements about him in the press, Defendants denied him due process of law under both the federal Constitution and the New

_____

[8] When Anemone requested a "name clearing hearing" in a letter sent by his attorney to the MTA on May 9, 2003, he was informed that the means of pursuing such a hearing under New York law was through an Article 78 proceeding. Unlike Casale, he never filed for such a proceeding. *Anemone*, 2008 WL 1956284, at *7.

26

York State Constitution. With respect to all his constitutional claims, he asserted that the individual Defendants had also conspired in violating his rights. Finally, he asserted state law claims against the MTA under New York Civil Service Law § 75-b.

On May 27, 2005, Sansverie moved to dismiss the complaint. In an opinion issued January 24, 2006, then-Chief Judge Michael B. Mukasey dismissed Anemone's due process and conspiracy claims against Sansverie, but did not dismiss the First Amendment claims. *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 264 (S.D.N.Y. 2006). The court noted that the speech for which Anemone alleged retaliation concerned MTA corruption and thus related to an issue of "public concern." *Id.* at 265. It further concluded that the allegations that Sansverie had instigated an allegedly retaliatory investigation leading to Anemone's suspension and firing were sufficient, if proven, to constitute an adverse employment action and that Anemone had sufficiently pleaded a causal connection between the protected speech and adverse action. *Id.* at 267. The district court also ruled that neither qualified immunity nor absolute immunity justified granting Sansverie's motion to dismiss on the First Amendment claims. *Id.* at 271. It determined, however, that Anemone had failed to state a claim for a procedural due process violation, as Sansverie had no means of providing Anemone with any process in the first place. *See id.* at 270. Finally, it dismissed *sua sponte* Anemone's various conspiracy claims against the individual Defendants, applying the intracorporate conspiracy doctrine and reasoning that all the individuals were employed by the MTA and agents of the MTA, and that the MTA cannot conspire with itself. *Id.* at 271. The district court later denied a motion for reconsideration on the intracorporate conspiracy ruling. *Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 603 (S.D.N.Y. 2006).

27

The case was subsequently reassigned to Judge Loretta A. Preska, and on May 2, 2008, she issued an opinion granting Defendants' motions for summary judgment on all remaining claims.[9] The district court concluded that even assuming that Anemone spoke on a matter of public concern, the MTA had an "adequate justification" to terminate him "because, on this record, a reasonable jury could not find that the MTA terminated him for 'exposing corruption' within the organization, that is, for speaking out on a matter of public concern." *Anemone*, 2008 WL 1956284, at *8. The district court found that "the *only* evidence of any *improper* retaliatory motive on the part of any Defendant is the fact that Anemone's suspension occurred on April 1, only three days after the publication of the *New York Times* article." *Id.* at *9 (emphasis in original). Moreover, it noted that, while temporal proximity is often sufficient to create an issue of fact as circumstantial evidence of improper intent, it is not in and of itself sufficient in every case. *Id.* at *10. The court pointed to the fact that Dellaverson decided to terminate Anemone and concluded that a reasonable jury could not find that Dellaverson had an improper motive, given Anemone's long and intensifying history of insubordination and Dellaverson's earlier active role in initiating and participating in the corruption investigations. *See id.* at 11–15. Anemone's speech to the *Times* was also "a 'unitary act' that could prompt either a permissible or impermissible response from the government employer." *Id.* at *12. Punishing Anemone for the disruptive character of the speech was permissible, the district court concluded, and Dellaverson testified that what he found objectionable was not exposure of the alleged "corruption" but that the allegations of a "cover up" were baseless and colored by

___

[9]Anemone had previously withdrawn his claims made pursuant to New York Civil Service Law § 75-b. *See Anemone*, 2008 WL 1956284, at *1.

28

implausible allegations of a terrorism threat. *Id.*

In the alternative, the court held that under *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287 (1977), no reasonable jury could fail to find that Anemone would have been terminated even without his speech to the *Times*, as a result of his various acts of insubordination which had led to an investigation that was already ongoing by the time he spoke to the newspaper. *Id.* at \*15. The district court held that Anemone's comments to the Queens DA's office and his testimony to the State Assembly were covered by *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006), and thus did not constitute protected speech. *Id.* at \*16. Finally, the district court dismissed Anemone's due process claim on the theory that a post-deprivation Article 78 remedy provided due process for any alleged stigma Anemone had suffered by virtue of the Defendants' actions. *Id.*

This appeal followed.

## DISCUSSION

### I. Standard of Review

This Court reviews grants of summary judgment *de novo. McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). We uphold a grant of summary judgment "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, 'there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'" *Id.* at 96 (omission in original) (quoting Fed. R. Civ. P. 56(c)).

### II. First Amendment Retaliation Claims

29

The district court granted summary judgment to Defendants on all of Anemone's First Amendment claims under § 1983 on at least one of the following three grounds. First, it held that no reasonable jury could find that Dellaverson terminated Anemone out of a desire to punish him for his allegedly protected expressive activity. Second, and in the alternative, it held that under *Mt. Healthy* a reasonable jury could not help but find that Anemone would have suffered the alleged adverse employment actions even in the absence of his allegedly protected activity. Third, it held that at least two instances that Anemone cites as protected activity — his contact with the Queens DA and his testimony before a State Assembly legislative committee — were in fact unprotected employee speech under *Garcetti*. We affirm the district court's grant of summary judgment to Defendants on the *Mt. Healthy* ground.[10]

## A. The Standard for Establishing a First Amendment Retaliation Claim

Anemone contends that he was subjected to adverse employment actions, culminating in his termination, in retaliation for his allegedly protected expressive activity exposing corruption in the MTA. He points to three instances of allegedly protected speech: (1) his (and Casale's) conversations with the Queens DA's office, culminating in the March 4, 2003, communication among Anemone, Casale, and Ryan regarding the Bauer/Plasser investigation; (2) his March 28, 2003 communication with *New York Times* reporters, which resulted in the *Times* article recounting Anemone's allegations that MTA officials were impeding corruption investigations and thereby

[10] Because we focus on the inevitability of Anemone's discipline and subsequent termination regardless of any protected speech, we have no occasion to consider whether, as Anemone argues, the district court should have analyzed the motivations of actors other than Dellaverson in assessing his retaliation claim.

"undermin[ing] efforts to protect the transit system from terrorism," App. at 228; and (3) his April 11, 2003 appearance before the New York State Assembly Standing Committee on Corporations, Authorities and Commissions.

This Court has previously outlined the standard for assessing when the speech of a public employee is protected from retaliation by the First Amendment. This standard "entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). To survive summary judgment on a First Amendment retaliation claim, a public employee "must bring forth evidence showing that he has engaged in protected First Amendment activity, he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action." *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). In addition, "when the plaintiff's protected conduct is a unitary event that could prompt either a permissible or an impermissible reason on the part of the defendant to act, . . . claims of alleged retaliation for the exercise of a constitutional or statutory right require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct." *Greenwich Citizens Committee, Inc. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 33 (2d Cir. 1996). The plaintiff bears the "initial burden of showing that an improper motive played a substantial part in defendant's action." *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003).

Even if the plaintiff makes out a prima facie retaliation claim, a government defendant may

31

still receive summary judgment if it establishes its entitlement to a relevant defense. One such defense, articulated in *Mt. Healthy*, 429 U.S. at 287, provides that "even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998). "The constitutional principle at stake [, i.e., freedom from retaliation for protected speech,] is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the [protected] conduct." *Mt. Healthy*, 429 U.S. at 285–86. This "principle prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct," *Heil*, 147 F.3d at 110, and ensures that an "employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements," *id.* (quoting *Waters v. Churchill*, 511 U.S. 661, 681 (1994) (internal quotation mark omitted)). We have noted that "although the language in *Mt. Healthy* refers to the plaintiff's *conduct*, the [Supreme] Court's analysis, properly understood, attempts to weigh the impact of the defendant's *impermissible reason* on the defendant's decision to act," such that a defendant can "avoid liability by showing that it would have taken the same action in the absence of the impermissible reason." *Greenwich Citizens Comm.*, 77 F.3d at 32. The burden is on the government to make out the defense. *Heil*, 147 F.3d at 110.

The government can also avoid liability under what is commonly referred to as the *Pickering* balancing test. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Under this defense, "[a] government employer may take an adverse employment action against a public employee for speech

32

on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." *Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir. 2003). Thus, "defendants may . . . escape liability if they can demonstrate that . . . the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008). Again, the burden is on the defendants. *Id.*

## B. Application of *Garcetti* to Plaintiff's Speech to the Queens DA

At the outset, Anemone claims that his and Casale's contacts with the Queens DA constitute First Amendment-protected speech on the ground that he and Casale "went outside the chain of command to make statements to a neutral third party about their suspicions about LIRR graft and MTA corruption." Appellant's Br. at 55  The district court held that these contacts were made "pursuant to [Anemone's] official duties" and were thus not insulated from employer discipline under *Garcetti*. *See Anemone*, 2008 WL 1956284, at *16 (citing *Garcetti*, 547 U.S. at 426). We agree with the district court.

*Garcetti* reinforced "the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)). Thus, the Supreme Court held that "when public employees make statements pursuant to their official duties, the

employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. This is true even when such speech regards a matter of public concern. *Huth v. Haslun*, 598 F.3d 70, 74 (2d Cir. 2010).

In *Weintraub v. Board of Education of the City School District of the City of New York*, 593 F.3d 196 (2d Cir. 2010), a public teacher filed a grievance with his union representative in response to the allegedly inadequate discipline imposed on a student who had thrown a book at him during class on two occasions. *Id.* at 198–99. This Court noted that, under *Garcetti*, "[t]he objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.'" *Id.* at 202. We held that "under the First Amendment, speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Id.* at 203. The grievance in that case "was 'pursuant to' [the plaintiff's] official duties because it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' as a public school teacher — namely, to maintain classroom discipline." *Id.* (citation omitted) (quoting *Williams v. Dallas Independent Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)).

Applying this framework to Anemone's and Casale's contacts with the Queens DA, we easily conclude that even assuming their speech to the Queens DA's office was on a matter of public concern, it was clearly pursuant to their official duties so as to fall squarely within *Garcetti*. Anemone testified that as Director of Security at the MTA, he regularly interacted with District Attorneys' offices and viewed cooperating with these offices as among his duties. There is no question that Casale's and Anemone's initial contacts with the Queens DA concerning the

34

Bauer/Plasser investigation were of this character — that Anemone sought to involve the DA's office in an official investigation being conducted by the JITF. Indeed, Anemone does not contend otherwise but instead argues that once he went "outside the chain of command" and persisted in these contacts after Lapp told him the investigation would be handled by the OIG, his *subsequent* discussions with the Queens DA were protected. For the following reasons, we disagree.

When a government employee concededly engages in speech pursuant to his official duties, the fact that he persists in such speech after a supervisor has told him to stop does not, without more, transform his speech into protected speech made as a private citizen. *Cf. Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008) ("[I]t would be incongruous to interpret *Garcetti*, a case concerned with allowing the government to control its employees within their jobs, as giving broader protections to disobedient employees who decide they know better than their bosses how to perform their duties."). Lapp, as Anemone's supervisor, was entrusted with ensuring that his official communications with investigating agencies like the Queens DA's office were "accurate, demonstrate[d] sound judgment, and promote[d] the employer's mission." *Garcetti*, 547 U.S. at 423. She thus had the authority to take corrective action with regard to such speech — an authority that did not evaporate simply because Anemone defied her instructions to turn the Bauer/Plasser investigation over to the OIG. Tellingly, there is no evidence in the record that Anemone ever told the Queens DA's office that the JITF was off the case, and that he was acting solely as a private person. Indeed, by his own testimony, Anemone contemplated the possibility that even after Lapp's instruction, his deputies might work on the Bauer/Plasser matter in conjunction with the Queens DA. In such circumstances, Anemone's contacts with the DA were clearly official, part and parcel of his

35

duties as MTA's Director of Security. Accordingly, we conclude that Anemone's and Casale's communications with the Queens DA's office did not constitute protected speech.[11]

## C. Defendants' *Mt. Healthy* Defense

We will assume for the purposes of this appeal that material issues of fact exist as to whether Anemone was acting in an official capacity or as a private citizen when he spoke to *New York Times* reporters and testified before the New York State Assembly's Standing Committee on Corporations, Authorities, and Commissions. Even assuming that Anemone spoke as a citizen on a matter of public concern in each instance, we nevertheless conclude that given the undisputed evidence of Anemone's insubordination and the MTA's ongoing efforts to address it — efforts beginning well before any allegedly protected conduct on Anemone's part — any reasonable jury would find that Anemone would have been terminated even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech. *See Scott*, 344 F.3d at 288. Accordingly, the Defendants properly were granted summary judgment regarding Anemone's remaining claims of unlawful retaliation.

### 1. Anemone's Insubordination

The record contains undisputed evidence of Anemone's insubordination and the resulting tension between Anemone and his superiors — tension that predated the Bauer/Plasser investigation, let alone the *New York Times* article, and only escalated thereafter. First, there is uncontroverted

---

[11] Because we conclude that both Anemone's and Casale's communications with the Queens DA's office were pursuant to their official duties, we need not decide whether Anemone has standing to assert a First Amendment claim on the theory that he was the subject of retaliation by reason of the allegedly protected speech of his subordinate, Casale. *See Huth*, 598 F.3d at 75.

evidence of a history of complaints regarding Casale — complaints that Anemone admittedly failed to investigate and, indeed, dismissed on the ground that "Nick wasn't hired to make friends." Anemone Dep. at 77. Anemone's failure to respond to complaints with respect to his deputy's conduct in these past instances was exacerbated by his failure to direct Casale to cooperate with the OIG investigation, despite clear knowledge that Casale was refusing to provide the OIG with the information it sought.

Second, Anemone routinely disregarded the chain of command. For example, Lapp explicitly informed Anemone in January 2003 that "[s]he wanted to determine the avenues of investigation that would be pursued" in the future and that there would be "drastic action" for non-compliance. *Id.* at 47. However, despite this clear directive, Anemone ignored her express instruction to turn the Bauer/Plasser investigation over to the OIG. Instead — and construing the record in the light most favorable to him — Anemone at best acceded to and then actively participated in Casale's continued contacts with the Queens DA's office without Lapp's knowledge: in his own words, Anemone "told [Lapp] what I thought she needed to know and nothing more." *Id.* at 392.

Third, Anemone either recklessly misled or outright lied to his superiors and the Queens DA's office throughout March 2003, until he was compelled to provide testimony to the OIG on March 27, with regard to the existence of a confidential informant. Lapp, Dellaverson, and Ryan, as well as Daly from the OIG, each testified that Anemone told him or her personally that there was a confidential informant providing information regarding the Bauer/Plasser investigation. Anemone does not seriously dispute this testimony, conceding that he told Lapp and Dellaverson that there was a confidential informant, and that he may have used the term with Ryan and Daly as well. Anemone

37

has since admitted that there was no confidential informant in the Bauer/Plasser investigation. He now claims these references were a "mistake" or alternatively reflected a belief that a confidential informant — whether Dellaverson, Trimarchi, or perhaps someone else — actually existed. However, given these repeated references, in conjunction with Anemone's evasive behavior in not directing Casale to cooperate with the OIG and his admitted attempt to create a "paper trail" with Casale to cover his tracks, any reasonable jury would necessarily conclude that, at best, Anemone was recklessly misleading his superiors and co-workers throughout the time in which the OIG was attempting to investigate the Bauer/Plasser allegations.

The evidence of Anemone's deception of Dellaverson is particularly telling. In March 2003, Anemone and Casale were "in [Dellaverson's] office . . . talking about how can [he] help them delay the Inspector General from bringing Casale in for testimony so they can get the confidential informant, the CI, who's in the wind, to testify." Dellaverson Dep. at 286. But as Anemone argues in his briefing to this Court, *Dellaverson* himself was this confidential informant. *See* Appellant's Br. at 14. As Anemone testified, "Gary Dellaverson was the key guy." Anemone Dep. at 435. Of course, it is a disputed issue of fact whether Dellaverson indicated to Anemone that the Bauer/Plasser allegations should be investigated, and we resolve that dispute in favor of Anemone for the purpose of this appeal. Nevertheless, Anemone's undisputed referencing of a confidential informant to *Dellaverson* — while Dellaverson was *himself* the key, putative confidential informant, as indicated in Anemone's briefing to this Court and in his deposition testimony — was clearly misleading.

As Anemone himself testified, even *before* he spoke to the *Times*, he believed his job was

in jeopardy. The record is clear and undisputed that, in fact, Anemone was right. *Mt. Healthy* provides a defense where a government employer can show that, even assuming an improper, retaliatory motivation, it would have taken the same adverse action against an employee in the absence of such motivation. *See Scott*, 344 F.3d at 288. We have little difficulty concluding as a matter of law that the Defendants in this case established their entitlement to the *Mt. Healthy* defense.

### 2. Anemone's Speech to the *Times*

This conclusion is not altered by the fact that Dellaverson has acknowledged that the *Times* article affected his decision to terminate Anemone.[12] Importantly, Dellaverson was very specific in his explanation of *why* he deemed the *Times* story relevant. Dellaverson, who played a significant role in Anemone's earlier, successful corruption investigations, specifically noted that it was both the perceived baselessness of Anemone's claims that his corruption investigations were being obstructed and the "connection of those baseless allegations to an assertion that placed MTA customers at risk." Dellaverson Dep. at 248. As Dellaverson phrased his concern, "[Anemone] . . . chose to misrepresent [facts] in a fallacious fashion to the reporters in order to make this connection that the organization . . . was not adequately securing itself for its customers." *Id.* at 260.

On this record, the Defendants may well have established their entitlement to a *Pickering* defense with respect to Anemone's remarks to the *Times*. Once Anemone demonstrated that his

---

[12] Unlike the speech to the *Times*, there is no indication that Anemone's April 11 testimony before the New York State Assembly's Standing Committee on Corporations, Authorities, and Commissions, the only other potentially protected speech at issue in this case, played any role in the decision to terminate Anemone.

39

speech to the *Times* was a motivating factor behind at least one of the adverse employment actions he suffered – namely, his termination – the Defendants, to make out a *Pickering* defense, were required to demonstrate that "(1) [their] prediction of disruption [from the speech was] reasonable; (2) the potential disruptiveness [was] enough to outweigh the value of the speech; and (3) [they] took action against [Anemone] based on this disruption and not in retaliation for the speech." *Locurto v. Giuliani*, 447 F.3d 159, 172–73 (2d Cir. 2006) (quoting *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995)).

With regard to the potential for disruption emanating from Anemone's remarks, Anemone himself recognized the MTA's legitimate concerns regarding public disclosure of security matters when explaining why, as a general matter, he needed the approval of Lapp to speak to the press. Thus, he acknowledged "a concern [within the MTA] that security issues shouldn't be public knowledge or our attempts to mitigate those security concerns shouldn't be publicly broadcast." Anemone Dep. at 18. As for the First Amendment value of Anemone's security-related speech, any weight we might ordinarily attach to such speech in other circumstances is diminished here by the fact that Anemone's claims that his investigation was impeded are conclusory, and belied by the record, which shows that authority over the Bauer/Plasser investigation was merely transferred to the OIG. Further, Anemone's connection of his obstruction allegations to terrorism concerns, the most incendiary aspect of his comments to the *Times*, is without factual support. *See Anemone*, 2008 WL 1956284, at *14. And perhaps most importantly, Anemone's status as the top-level MTA official with respect to security issues, including safeguarding transit riders from terrorist threats, weighs heavily against him in the *Pickering* balance. *See McEvoy v. Spencer*, 124 F.3d 92, 103 (2d

Cir. 1997) ("[W]here the employee holds an extremely confidential or highly placed advisory position, it would be unlikely if the *Pickering* balance were to be struck in his favor. The tremendous disruption to the public workplace likely to result from the critical speech of such an employee would in most cases outweigh any First Amendment interests possessed by that employee."); *see also Rankin v. McPherson*, 483 U.S. 378, 390 (1987) ("The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.").

All this said, we need not resolve whether the Defendants established their entitlement to a *Pickering* defense on the record here, because we conclude that the clearly disruptive character of Anemone's speech to the *Times* provides yet further support for our determination that a *Mt. Healthy* defense has been amply made out. Under *Mt. Healthy*, evidence of the disruptive impact of potentially protected speech is relevant to the extent that it serves as an additional, permissible reason for which the government could have taken an adverse employment action against a government employee. Thus, as noted previously, "although the language in *Mt. Healthy* refers to the plaintiff's [protected] *conduct*, the Court's analysis, properly understood, attempts to weigh the impact of the defendant's *impermissible reason* on the defendant's decision to act." *Greenwich Citizens Comm.*, 77 F.3d at 32; *see also Scott*, 344 F.3d at 288 (stating that in establishing a *Mt. Healthy* defense, the defendant must "show it would have taken exactly the same action absent the *improper motive*" (emphasis added)). The relevant question then, with respect to Anemone's speech to the *Times*, is not whether he would have suffered termination absent the speech itself, but rather whether "even without the improper motivation the alleged retaliatory action would have occurred."

41

*Scott*, 344 F.3d at 287–88.

We conclude that even assuming the Defendants here acted partly on the basis of an improper retaliatory motive emanating from Anemone's speech to the *Times* — a generous assumption, even viewing the record in the light most favorable to Anemone — any reasonable jury would determine that Anemone would have suffered termination absent any such motive. Considering both Anemone's non-speech-related misconduct, beginning with his superiors' initial dissatisfaction with his ability to control his deputy Casale and extending to his pattern of insubordination and deception from February through March 2003, and the disruptive character of his speech to the *Times*, there is simply no question of material fact that Anemone would have been suspended and terminated in any event.

Finally, while the close proximity of the Interim Report to the *Times* interview might ordinarily give rise to an inference that an impermissible motive prompted both the issuance of the Report and Anemone's subsequent discipline, we agree with the district court that the timing here reflected instead the steady accumulation of misconduct on Anemone's part – misconduct prompting the ultimate conclusion that suspending and then terminating him was necessary. As discussed above, the full extent of Anemone's misconduct only became clear at the very end of March, with his and Casale's depositions before the OIG revealing the extent to which they had failed to cooperate in the Bauer/Plasser investigation. The disruptive dimension to his *Times* comments then provided even further permissible and non-retaliatory reasons to discipline him. Ultimately, we find no material question of fact as to whether the Defendants in this case would have issued the Interim Report, placed Anemone on administrative leave and subsequently terminated him in the absence

42

of any potentially retaliatory intent arising out of protected speech.[13]   The district court therefore properly granted summary judgment to the Defendants pursuant to *Mt. Healthy*.[14]

## III. Remaining Claims

With respect to Plaintiff's procedural due process claims, in *Segal v. City of New York*, 459 F.3d 207 (2d Cir. 2006), we held that "in the context of an at-will government employee, a reasonably prompt, post-termination name-clearing hearing satisfies constitutional due process as long as the procedures afforded at such a hearing are sufficient to protect the employee's reputational

---

[13] We assume without deciding that the Interim Report constituted an adverse employment action.  With regard to his suspension and subsequent termination, Anemone asserts in his brief to this Court that "[t]he district court erred by conflating the MTA's adverse acts of 'termination' and 'suspension.'" Appellant's Br. at 53.  We find that the undisputed evidence in the record establishes Defendants' *Mt. Healthy* defense for both instances of allegedly retaliatory adverse employment actions.

[14] Anemone also asserts that the April 18 letter sent by Sansverie to Kalikow concerning Anemone's conduct in forming the CTAB was a separate adverse employment action suffered in retaliation for protected conduct.  It is clear, however, that this letter is not itself sufficient to constitute an adverse employment action.  This Circuit has been cognizant of the fact that "adverse employment actions" can take a wide variety of forms, *see Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006), although we have noted that "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action," *id.* at 225 (quoting *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004).  While the standard set out is broad, however, no reasonable jury could find that the April 18 letter sent by Sansverie constitutes such an action.  The letter included no proposed disciplinary measure but instead simply reported information gathered by Sansverie's office in connection with his duties as the MTA's Inspector General, a position limited, as the district court put it in the initial decision issued in this case, "to investigating abuse and recommending remedial action and [which] does not contemplate any role for him in adjudicating an employee's employment status with the MTA." *Anemone*, 410 F. Supp. 2d at 270; *see also* N.Y. Pub. Auth. Law § 1279(4).  Furthermore, there is no indication that the April 18 letter was even considered in the subsequent decision to terminate the already suspended Anemone.  Under these circumstances, we cannot conclude that this letter, even assuming it was sent in retaliation for protected speech, constituted an adverse employment action.

and professional interests.  The availability of such a hearing . . . defeats [plaintiff's] stigma-plus claims."  *Id.* at 218.  An Article 78 proceeding provides the requisite post-deprivation process — even if Anemone failed to pursue it.  *See*, e.g., *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984).  Anemone concedes his argument to the contrary requires overturning *Segal*, which a panel of this Court cannot do.  Thus, we affirm the district court's dismissal of his "stigma-plus" due process claims.

With respect to Anemone's conspiracy claim, having found that none of the individual Defendants in this case violated Plaintiff's constitutional rights, we need not decide whether they can properly be charged with conspiring to violate these rights under § 1983.  As a result, we do not pass on this question.

**CONCLUSION**

For all of the foregoing reasons, the judgment of the district court is therefore **AFFIRMED**.